734 F.2d 1200
 11 Collier Bankr.Cas.2d 1, 11 Bankr.Ct.Dec. 1310,
Bankr. L. Rep. P 69,872
 Gerald W. MOODY, and Jermoo's Incorporated,
Debtors-in-Possession, Plaintiffs- Appellants,
v.
AMOCO OIL COMPANY, Defendant-Appellee.
 No. 83-2457.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 5, 1983.
Decided May 14, 1984.
Rehearing and Rehearing En Banc Denied July 3, 1984.
 
 David G. Walsh, Walsh, Walsh, Sweeney & Whitney, S.C., Madison, Wis., for debtors-in-possession, plaintiffs-appellants.
 Gregory E. Scallon, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant-appellee.
 Before BAUER and FLAUM, Circuit Judges and EVANS, District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 This appeal raises a number of issues arising under the interim bankruptcy rule (interim rule) adopted by the district courts of this circuit, the Bankruptcy Reform Act of 1978 (codified at 11 U.S.C. and scattered sections of the United States Code), and the Petroleum Marketing Practices Act of 1978 (PMPA), 15 U.S.C. Secs. 2801-2806 (1982). The appeal involves an adversary proceeding arising out of debtors' reorganization cases filed under chapter 11 of the Bankruptcy Code. The bankruptcy court held both that debtors could not assume certain allegedly executory contracts and that debtors were not entitled to preliminary injunctive relief under the PMPA, Matter of Moody, 31 B.R. 216 (Bkrtcy.W.D.Wis.1983). The district court affirmed the bankruptcy court's order and remanded the case to the bankruptcy court for entry of final judgment. Because we hold that debtors' claim for relief under the PMPA is a "related proceeding" within the meaning of the interim rule, we reverse that portion of the district court's opinion remanding the PMPA claim to the bankruptcy court. We also reverse the district court's holding that debtors may not assume the jobbership contract. We affirm the remainder of the district court's opinion.
 
 I. Facts
 
 2
 Appellants Gerald W. Moody and his solely-owned business Jermoo's, Inc., ("debtors") conduct retail petroleum dealerships ("the dealerships") at three separate locations in Wisconsin. Appellee Amoco Oil Company ("Amoco") is the supplier and franchisor for each location. Debtors also conduct wholesale petroleum operations as an Amoco jobber ("the jobbership"). Because the dealerships and the jobbership are subject to separate agreements between the parties, we will discuss them separately.
 
 A. The Dealerships
 
 3
 Debtors' dealerships are located in Oakdale, Mauston, and Tomah, Wisconsin.[1] Each dealership is separate and subject to a separate set of lease and contract agreements.[2] There are no cross-default provisions among the dealership contracts. Debtor Moody has been an Amoco dealer since 1958. He has won numerous awards from Amoco. Until the course of events giving rise to this appeal, he had never been cited for any violation of any dealership agreements.
 
 
 4
 Debtors allege that on January 26, 1983, their bank accelerated a loan to debtors and seized the balance in their checking account as a setoff. The bank subsequently dishonored all checks submitted for payment.[3]
 
 
 5
 On January 27, 1983, Amoco was notified that certain checks given to it by debtors for payment for fuel had been dishonored. The same day, Amoco verbally notified debtors of the dishonored checks. Amoco told debtors that unless the checks were cured by the next day, Amoco would pump dry the fuel tanks at Oakdale and Mauston and would provide no further gasoline to debtors until the checks were cured. Amoco testified that this was standard practice and pursuant to written agreement between the parties.[4] Amoco also mailed to debtors a demand that debtors cure the dishonored checks within five days. The five-day cure notice was addressed to Mr. Moody, Jermoo's Inc., at Mauston. That notice listed five checks as dishonored. The return receipt completed by Amoco refers to the addressee as "jobber." The five-day cure notice did not specify which check pertained to which dealership or jobbership.
 
 
 6
 Debtors state that on January 27, they executed chapter 11 petitions in bankruptcy and instructed their counsel to file them the next day.
 
 
 7
 On January 28, debtors' counsel contacted Amoco. The parties agreed that Amoco would not pump its tanks dry and would continue to supply gasoline to debtors while debtors attempted to put together a settlement proposal. Debtors state that they told Amoco that they would file under chapter 11 that day unless Amoco agreed not to pump the tanks. Debtors state that Amoco agreed to maintain "the status quo." Debtors allege that, acting on the advice of their counsel, they waited to cure the checks because of the standstill agreement. Amoco states that the standstill agreement pertained only to Amoco continuing to supply gasoline; there was no standstill agreement as to the cure period for the dishonored checks.
 
 
 8
 On January 29, 1983, debtors received the five-day cure notice from Amoco.
 
 
 9
 On January 31, debtors' counsel met with Amoco to attempt to settle all disputes between the parties. On February 2, Amoco notified debtors' counsel that the settlement proposal was unacceptable. On February 3, debtors received a cure notice from Amoco, by certified mail (dated February 2), listing two dishonored checks from the Oakdale dealership and demanding cure within five days.
 
 
 10
 Also on February 3, Amoco sent by certified mail two separate termination notices to debtors. The first pertained to Oakdale. It stated that two dishonored checks had been received and that the five-day grace period for cure had expired. The notice further provided that "additional N.S.F. checks have been received and at this time constitute further contract violations. Please consider this our notice to cancel [the Oakdale dealership] per Paragraph 15h of said lease. Said cancellation is to become effective ninety-days from the date of this letter." The letter included a summary statement of the PMPA, as required under the PMPA. The notice as to Mauston was identical, but it identified two other checks as dishonored. It was addressed to Mr. Moody at "Hwy. 82 & I-90/94" in Mauston.
 
 
 11
 Paragraph 15h of each lease provides that Amoco may terminate the lease because of:
 
 
 12
 [a]ny other reasonably convincing evidence of financial distress of Lessee, such as, without limitation, ... the giving of one or more Non Sufficient Fund checks which remain dishonored after five days from the postmark date ... of notice from Lessor to cure the dishonor, and the like.
 
 
 13
 The leases also provide that "[t]he postmark date shall be the date of any notice sent by certified mail." Finally, the leases state that any notice sent to the lessee shall be sent to the address as shown in the lease. The Mauston lease shows Moody's address as 105 Murphy Drive in Mauston.
 
 
 14
 Sometime on February 4, 1983, debtors received the Oakdale and Mauston termination notices. The return receipt shows a postmark date of February 4 as the date received. Debtors filed their chapter 11 petition on February 4.
 
 
 15
 Moody testified that debtors could not have cured the checks during the five-day cure period, but that debtors have been ready, willing, and able to cure since the commencement of the instant adversary proceeding.[5]
 
 B. The Jobbership
 
 16
 By certified letter dated August 3, 1982, Amoco notified debtors that it elected to terminate and nonrenew the jobbership effective November 3, 1982. Amoco gave as its reason more than $230,000 in arrearages in the jobbership account that had existed since September 1981. Amoco later withdrew the termination notice and extended the deadline for payment of the arrearages into 1983. By certified letter dated February 1, 1983, Amoco issued a new notice of termination as to the jobbership, to be effective May 6, 1983. Debtors received the notice on February 3, 1983. The notice provided that the debtors had fifteen days from the postmark date of the letter to cure the default. Debtors did not cure the arrearages within the fifteen days and have not cured to date.
 
 C. Procedural History
 
 17
 Debtors commenced this adversary proceeding in bankruptcy court on April 14, 1983. They argued that they could assume the dealership and jobbership contracts under section 365 of the Bankruptcy Code and that the terminations of the dealerships and jobbership were wrongful and ineffective under the PMPA.[6]
 
 
 18
 A full-day evidentiary hearing was held before the bankruptcy court on May 18, 1983.[7] On June 2, 1983, the bankruptcy court entered a Memorandum Decision and Order for Judgment in favor of Amoco. The court held that the contracts could not be assumed because the contracts had been terminated prior to debtors' filing their chapter 11 petitions. The court found no basis to equitably estop Amoco to terminate the contracts. The court also found that debtors were not entitled to injunctive relief under the PMPA. Debtors had failed to show any serious question as to "fair grounds" for litigation as required under section 2805 of the PMPA. The bankruptcy court did not enter final judgment on its decision.
 
 
 19
 On June 3, 1983, debtors filed with the district court a motion for withdrawal of the reference from the bankruptcy court pursuant to the interim rule. Debtors also filed, either additionally or alternatively, a notice of appeal and motion for stay pending appeal.
 
 
 20
 The district court held an initial hearing. The court denied as untimely the motion for withdrawal of the reference. The court held an additional evidentiary hearing and invited the parties to supplement the record through affidavits.
 
 
 21
 On July 29, 1983, the district court affirmed the bankruptcy court's decision and remanded the case to the bankruptcy court for entry of judgment. The court held that this case is not a related proceeding within the meaning of the interim rule. Debtors appealed.
 
 
 22
 The parties' arguments on appeal to this court may be summarized as follows. Debtors argue that this case presents a "related proceeding" within the meaning of the interim rule. The district court did not exercise the appropriate standard of review of the bankruptcy court's order. Debtors may assume the dealership contracts because the contracts were not properly and timely terminated. Even if the contracts were terminated, they may be assumed because section 365 of the Bankruptcy Code allows revival of a terminated contract. Debtors argue that they may assume the jobbership contract despite their failure to cure the defaults within sixty days after filing for reorganization. Finally, termination of the contracts should be enjoined under the PMPA.
 
 
 23
 In response, Amoco argues that this case is not a related proceeding and that even if it is, the district court's review of the bankruptcy court order was proper. A contract that is properly terminated pre-bankruptcy may not be revived or assumed. Debtors' failure timely to cure the defaults in the jobbership contract preclude its assumption. The bankruptcy court and the district court did not abuse their discretion in not enjoining the terminations under the PMPA.
 
 II. The Interim Rule
 A. Related Proceeding
 
 24
 Debtors argue that their action to assume the dealership and jobbership contracts and to receive preliminary injunctive relief is a "related proceeding" under the interim rule. They argue that the dispositive issue in the case is whether the contracts were properly terminated pre-bankruptcy, which is a matter of state law; the question of assumption is dependent on and collateral to the question of termination. The question of entitlement to injunctive relief is governed solely by the PMPA. Thus, debtors argue, this case is not a traditional bankruptcy case but rather is a related proceeding.
 
 
 25
 Amoco argues that the issues of termination and injunctive relief under the PMPA are presented solely in the context of debtors' right to assume the contracts. It argues that assumption is a contested matter concerning assets and administration of the estate; additionally, since Amoco is a creditor of the estate, the case is similar to a counterclaim by the estate. Thus, this case does not fit the definition of a related proceeding within the meaning of the interim rule.
 
 
 26
 The district court held that this case is not a related proceeding. The court defined a related proceeding as one where a debtor brings a noncreditor into bankruptcy court concerning an issue that is not related to the issues of the bankruptcy. Here, the issue of assumability of the contracts is a bankruptcy question and Amoco was a creditor.
 
 
 27
 In Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court held unconstitutional as a violation of article III the vesting of the district court's bankruptcy jurisdiction in bankruptcy judges. In order to provide for the continuing operation of the bankruptcy system, the United States District Court for the Western District of Wisconsin adopted the interim bankruptcy rule on December 24, 1982.[8] Under the interim rule, all cases arising under the Bankruptcy Code and all civil proceedings arising in or related to such cases are automatically referred to the bankruptcy courts. In traditional bankruptcy cases, the bankruptcy court may issue orders and judgments that are effective on entry. In "related proceedings," only the district court may enter a final order unless the parties consent to entry by the bankruptcy court.
 
 
 28
 The interim rule defines related proceedings as
 
 
 29
 those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court. Related proceedings include, but are not limited to, claims brought by the estate against parties who have not filed claims against the estate.... A proceeding is not a related proceeding merely because the outcome will be affected by state law.
 
 
 30
 Interim Rule p (d)(3)(A). Whether or not an action is a related proceeding within the meaning of the interim rule depends on whether the right sued on arises under the federal bankruptcy law. See Salomon v. Kaiser, 722 F.2d 1574, 1581-82 (2d Cir.1983). In Salomon, the bankruptcy judge had imposed a constructive trust on real estate that the debtor had fraudulently transferred. On appeal, the debtor argued that an action to impose a constructive trust was a related proceeding, and thus the bankruptcy judge could not enter final judgment. The court of appeals acknowledged that an action to impose a constructive trust could be brought in state court. The court, however, stated that
 
 
 31
 [t]his action is inextricably tied to the creation of the estate in bankruptcy for the benefit of [the debtor's] creditors; there would be no cause of action without the federal bankruptcy statutes that authorize it. In other words, federal law provides that right upon which the remedy of the constructive trust sought here is based....
 
 
 32
 The present action ... has no life of its own in either state or federal common law or statute independent of the federal bankruptcy laws.
 
 
 33
 Id. (emphasis in original). Thus, the case was not a related proceeding.
 
 
 34
 Similarly, a debtor has no right to assume an executory contract except under federal bankruptcy law. An action to assume a contract could not, in the absence of a petition in bankruptcy, be brought in state court or district court. The outcome of the action to assume may be affected by state law, but the interim rule provides that that is not determinative. Thus, debtors' action here to assume the dealership and jobbership contracts is not a related proceeding. See also Seacoast Products, Inc. v. Spring Valley Farms, Inc., 34 B.R. 379, 380 (M.D.N.C.1983).
 
 
 35
 The question of entitlement to injunctive relief under the PMPA, on the other hand, does not arise under the federal bankruptcy law. It is purely a statutory right arising under the PMPA. The debtors could have brought this cause of action in federal district court even if they had not filed a bankruptcy petition. The fact that Amoco is also a creditor of the estate is not determinative, because the rule expressly states that related proceedings are not limited to claims against noncreditors.[9] Thus, debtors' cause of action under the PMPA is a related proceeding within the meaning of the interim rule.
 
 
 36
 We note that debtors have not raised any constitutional challenge, either to the validity of the interim rule itself or to the propriety of the bankruptcy court entering judgment on its claims. Thus, our holding on this point is purely an interpretation of the interim rule and not a matter of constitutional law. In Northern Pipeline, the Supreme Court held only that state common law causes of action cannot constitutionally be decided by a bankruptcy court. The Court did not reach the issue of whether the Constitution allows a bankruptcy court to adjudicate a cause of action arising solely under nonbankruptcy federal statutory law. See Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. at 89-92, 102 S.Ct. at 2880-2882 (Rehnquist, J., concurring). We also do not reach this issue.
 
 B. District Court's Standard of Review
 
 37
 Debtors argue that, under the interim rule, the district court had to review the proceedings in the bankruptcy court de novo. Debtors appear to argue that, under the rule, they are entitled to a trial de novo of their related proceeding. They argue that the district court failed to perform its function because the district court's opinion discussed only two of the issues raised by debtors; on the other issues the district court adopted the bankruptcy court's findings and conclusions.
 
 
 38
 Amoco argues that a trial de novo is not required by the rule. The district court fulfilled its function of any de novo review that the rule requires. The court reviewed the record and took additional evidence. The court stated that it did not give deference to the findings and conclusions of the bankruptcy court. Amoco argues that a district court need not expressly address every issue raised. Thus, Amoco contends, there was no violation of the interim rule.
 
 
 39
 The interim rule establishes a system for district court review of bankruptcy court proceedings. In nonrelated proceedings, the interim rule provides that the district court shall review orders entered by the bankruptcy court if a notice of appeal is filed. In related proceedings, the bankruptcy judge "shall submit findings, conclusions and a proposed judgment or order to the district judge." Interim Rule p (d)(3)(B). The district court must review these regardless of whether a notice of appeal is filed. Id. at p (e)(2)(A)(iii). The interim rule also provides:
 
 
 40
 In conducting review [in both related and nonrelated proceedings], the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge and need give no deference to the findings of the bankruptcy judge.
 
 
 41
 Id. at p (e)(2)(B). Thus, the interim rule clearly provides that the bankruptcy court will provide the district court with findings and conclusions. By providing that the district court may accept, reject, or modify the proposed order, the rule clearly contemplates that the court may adopt all or part of the order. The rule also makes the holding of a hearing and the taking of additional evidence discretionary with the district court. Thus, the interim rule does not require the district court to conduct a trial de novo or to issue a completely separate opinion.
 
 
 42
 The issue of whether this case is a related proceeding was not raised before the bankruptcy court. The bankruptcy court issued a memorandum decision rather than proposed findings and conclusions. We do not regard this difference as critical, and we shall treat the decision as though it were proposed findings and conclusions.
 
 
 43
 Although this is a close case, we find that the district court fulfilled the requirements of the interim rule here. De novo review requires the district court to make an independent judgment of the issues. Cf. English v. Local Union No. 46, 654 F.2d 473, 478 (7th Cir.1981) (review of magistrate's recommendation). The district court conducted two hearings. It invited the parties to submit affidavits. The court stated in its opinion that it examined the entire record before the bankruptcy court and gave no deference to the bankruptcy court's findings and conclusions. The court did all that the rule requires.
 
 
 44
 Debtors' argument that the district court could not adopt the bankruptcy court's opinion misconstrues the nature of de novo review. It is not the form of the district court's opinion that is critical but rather the process that the court uses in reviewing the bankruptcy court's opinion. It is preferable for a district court to write separately to express its views on complex and novel issues such as those presented here. But while a district court may not merely rubber stamp a bankruptcy court opinion, it may adopt the opinion where, as here, the court has examined the record without giving deference to the bankruptcy court's findings and conclusions.
 
 
 45
 Debtors have stated that they are not raising any constitutional objections to the proceedings below. Instead, their claim is that the district court did not fulfill its duty under the interim rule. Thus, we do not reach the issue of whether the Constitution requires more than what the district court did here; our decision is limited solely to the scope of the interim rule.
 
 III. The Bankruptcy Code
 
 46
 Debtors raise six different arguments as to why they can assume the contracts. We shall address them separately.
 
 A.
 
 47
 Debtors' first argument is related to the procedural requirements for termination of the contracts. They argue that they may assume the dealership contracts because the contracts were not properly terminated according to the contractual terms. Debtors contend that the contracts require that written notice of dishonored checks and five days to cure be given before a notice of termination is sent. Debtors maintain that the only cure notice received as to Oakdale was mailed the same day as the termination notice, February 2. As to Mauston, debtors argue that the cure notice, dated January 27, was insufficient because: it did not specify to which franchise the checks pertained; the return receipt address contained the word "jobber"; and the cure notice was not mailed to the address specified in the lease. The termination notice as to Mauston was also insufficient because it was mailed to the wrong address. Furthermore, debtors argue that strict compliance with the notice requirements of the PMPA is essential to lawful termination. The notices here did not comply with the PMPA. Thus, debtors argue, the contracts were never terminated.
 
 
 48
 Amoco, on the other hand, argues that the dealership termination notices complied with both the contracts and the PMPA. Amoco maintains that debtors have conceded that the cure notices were proper and that in any event defects in a cure notice have nothing to do with whether termination notices are proper. As to Oakdale, the termination notices stated that, beyond the checks identified by number, "additional N.S.F. checks have been received and at this time constituted further contract violations." The notice also stated that the termination was "per Paragraph 15h" of the lease, which gives Amoco the right to terminate due to "reasonably convincing evidence of financial distress" of a franchisee. Amoco argues that the checks listed in the January 27 cure notice, regardless of the franchise to which they pertain, constitute "reasonably convincing evidence" of debtors' financial distress. As to Mauston, Amoco argues that nothing in the PMPA requires that a termination notice specify the franchise to which a dishonored check relates or that the notice be mailed to a particular address.
 
 
 49
 We turn first to the question of whether the termination procedure complied with the PMPA. The notice provisions of the PMPA are contained in section 2804, which provides in pertinent part:
 
 
 50
 (c) Notification under this section--
 
 
 51
 (1) shall be in writing;
 
 
 52
 (2) shall be posted by certified mail ...;
 
 
 53
 (3) shall contain--
 
 
 54
 (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;
 
 
 55
 (B) the date on which such termination or nonrenewal takes effect; and
 
 
 56
 (C) the summary statement [of remedies and relief available].
 
 
 57
 A franchisor must comply strictly with the notice requirements of the PMPA. Escobar v. Mobil Oil Co., 678 F.2d 398, 400 n. 2 (2d Cir.1982); Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380, 1390 (10th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982). Here, there is no dispute that the termination notices were in writing, sent by certified mail, and contained the reason for the termination, the date of termination, and the summary statement. There is no requirement that notices be sent to a particular address. Where, as here, there is no dispute that the different address resulted in no actual delay in receipt by the franchisee, there is no violation of the PMPA notice requirements on that account.
 
 
 58
 Debtors' argument seems to be that the reasons stated in the notice were insufficient under the PMPA, and thus the notices themselves were insufficient. This court has previously rejected a similar argument. Brach v. Amoco Oil Co., 677 F.2d 1213, 1226 (7th Cir.1982). In Brach, the franchisee argued that if the reason given for nonrenewal was insufficient under the PMPA, the notice failed to give a reason and thus was insufficient under the PMPA. The court ruled that this confused the grounds for nonrenewal with the reasons for nonrenewal. The court held that "the PMPA requires only that the franchisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." Id. The court found the reasons given in that case sufficient to apprise the franchisee of his rights. Here, the reason given for termination pointed to a specific paragraph in the parties' agreement. Debtors have not contended that they were unable to determine the reason given or that they did not understand their rights under the PMPA. Thus, the reason given in the termination notices was sufficient to meet the procedural notice requirements of the PMPA.
 
 
 59
 We turn next to the issue of whether the termination notices complied with the procedural requirements of the contracts. As to Mauston, the lease does provide that the notices shall be sent to "105 Murphy Drive" rather than to "Hwy. 82 & I-90/94," where the notices actually were sent. The purpose of such a provision is to ensure that the franchisee receives timely notice. Where, as here, there is no dispute that the difference in address caused no delay in receipt, the discrepancy is harmless. Further, as to Mauston, the contract does not require that a cure notice must specify to which franchise a dishonored check applies. There is no dispute that two of the checks on the January 27 cure notice related to the Mauston dealership. Thus, debtors had sufficient notice under the franchise contracts. As to Oakdale, debtors' failure to cure the checks listed in the January 27 cure notice was evidence of their financial distress, regardless of the franchise to which the checks pertained. According to the contract provision, it is not the failure to cure the dishonored checks within five days that is the grounds for termination; the failure to cure is evidence of financial distress. Thus, the contracts were properly terminated by their own terms.
 
 B.
 
 60
 Debtors' second argument relates to the timeliness of the notice of termination of the contracts. Debtors argue that the termination notices were effective only on receipt. Because debtors did not receive the notices until February 4, the day that they filed for bankruptcy, the contracts were not terminated pre-bankruptcy and may be assumed. Debtors argue that under Wisconsin law notice served by mail is not effective until receipt, unless the rule is varied by an unambiguous agreement between the parties. The contract here provides that "[t]he postmark date shall be the date of any notice sent by certified mail." Certified mail results in at least two postmarks--one showing the date of mailing and one showing the date of receipt. Thus, according to debtors, the contract is ambiguous and does not vary the rule that notice by mail is effective only on receipt. Amoco, in turn, argues that the word "postmark" is unambiguous and thus does change the usual rule.
 
 
 61
 We find debtors' argument to be without merit. If we accept the argument, the contract provision would be superfluous. Had the parties intended the date of receipt to control--the usual rule--they need not have included the provision. We must interpret a contract so as to give effect to each provision. American Motorists Insurance Co. v. Trane Co., 544 F.Supp. 669, 678 (W.D.Wis.1982), aff'd, 718 F.2d 842 (7th Cir.1983); Stanhope v. Brown County, 90 Wis.2d 823, 280 N.W.2d 711 (1979). Furthermore, we note that Wisconsin law recognizes that where service of process by certified mail is authorized by statute, service is deemed complete upon mailing. Schroedel Corp. v. State Highway Commission, 38 Wis.2d 424, 157 N.W.2d 562 (1968).
 
 
 62
 Thus, the termination notices were effective when they were mailed, before the debtors filed for bankruptcy.
 
 C.
 
 63
 Debtors' third argument relates to the timeliness of effectiveness of termination of the dealership contracts. They argue that the terminations were not effective for ninety days from the date of notice, and they filed under chapter 11 before the ninety-day period expired. Thus, according to debtors, the contracts were still executory when they filed and could be assumed under section 365.
 
 
 64
 Amoco argues that the ninety-day waiting period before the effective date of the termination does not give debtors the right to assume the contracts. After the termination notices were sent, all that remained under the contracts was the passage of time until the terminations were complete. Amoco argues that when debtors filed, there was nothing left to assume under the contract except the remaining time--ninety days--before the contract was terminated completely.
 
 
 65
 Section 365 of the Code only gives a debtor the right to assume an executory contract. If a contract has been terminated pre-bankruptcy, there is nothing left for the debtor to assume. However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law. L. King, 2 Collier on Bankruptcy p 365.03 (15th ed. 1979); see In re Fontainebleau Hotel Corp., 515 F.2d 913 (5th Cir.1975).
 
 
 66
 As discussed above, here the dealership termination notices were effective prior to debtors' filing in bankruptcy. The contract gave debtors no right to cure once the termination notices were mailed. Amoco did not have to take any further action to terminate the contracts; termination was automatic at the end of ninety days. Wisconsin law also gives debtors no right to cure.[10]
 
 
 67
 The fact that the termination itself was not effective for ninety days does not affect the result. The filing of the chapter 11 petition cannot expand debtors' rights as against Amoco. Schokbeton Industries, Inc. v. Schokbeton Products Corp., 466 F.2d 171, 176-77 (5th Cir.1972); see Kopelman v. Halvajian (In re Triangle Laboratories, Inc.), 663 F.2d 463, 467-68 (3d Cir.1981). When the termination notice was sent, debtors only had a right to ninety days' worth of dealership contracts. The filing of the petition does not expand that right. This conclusion is supported by a number of decisions in the bankruptcy courts. See, e.g., New Media Irjax v. D.C. Comics, 19 B.R. 199 (Bkrtcy.M.D.Fla.1982); In re Benrus Watch Co., 13 B.R. 331 (Bkrtcy.S.D.N.Y.1981); In re Beck, 5 B.R. 169 (Bkrtcy.D.Haw.1980).
 
 
 68
 Similarly, section 541(a) provides that a debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of a case." Thus, whatever rights a debtor has in property at the commencement of the case continue in bankruptcy--no more, no less. Section 541 "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case." H.R.Rep. No. 595, 95th Cong., 1st Sess., reprinted in 1978 U.S.Code Cong. & Ad.News 5787.
 
 
 69
 Section 362, which creates an automatic stay of certain creditor actions upon the filing of a petition in the bankruptcy court, does not help debtors here. The automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract. See Johnson v. First National Bank of Montevideo, 719 F.2d 270, 273 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). See also, e.g., In re Anne Cara Oil Co., 32 B.R. 643, 647-48 (Bkrtcy.D.Mass.1983); In re Nashville White Trucks, 5 B.R. 112, 117 (Bkrtcy.M.D.Tenn.1980). Section 362 does not give a debtor greater rights in a contract. Trigg v. United States, 630 F.2d 1370, 1372 (10th Cir.1980). Thus, debtors cannot rely on section 362 to prevent termination of the contracts.
 
 D.
 
 70
 Debtors argue that the Mauston dealership is assumable because of the standstill agreement that the parties entered into on January 28. Debtors allege that pursuant to this agreement their counsel told them that it was not necessary to cure the checks. Debtors contend that this agreement tolled the running of the five-day cure period, and therefore, the termination notices were issued prematurely and were not effective. Debtors also argue that by entering into the standstill agreement, Amoco induced them not to cure the dishonored checks. Debtors argue that they delayed filing their bankruptcy petitions after settlement negotiations failed because Amoco induced them to believe that they had several days left to cure. Thus, Amoco is equitably estopped to terminate the dealership.
 
 
 71
 Amoco responds that the standstill agreement between the parties pertained only to whether Amoco would immediately pump its tanks dry. The parties agreed that Amoco would continue to supply debtors with petroleum products pending settlement negotiations. Amoco states that it never represented to debtors that they need not cure the checks. Thus, Amoco argues, there is no basis either to find the cure period tolled or to find Amoco equitably estopped to terminate the dealership.
 
 
 72
 The district court found that Amoco had never explicitly or implicitly agreed to any standstill of the cure period, only to a standstill of pumping its tanks. The court found nothing to indicate that Amoco had done anything to induce debtors not to cure the checks. The court found that debtors had delayed filing bankruptcy petitions because Amoco agreed to consider a settlement offer. However, because debtors had over a day to file between the time that Amoco rejected the offer and the time that the termination notices were mailed, the court found no basis for equitable estoppel.
 
 
 73
 The district court's finding that the standstill agreement related only to pumping the tanks dry and not to the cure period is a finding of fact that we cannot reverse unless it is clearly erroneous. Fed.R.Civ.P. 52(a). On the record before us, we cannot disagree with the district court, particularly where, as here, the finding is based in part on the credibility of the witnesses. Moreover, debtor Moody testified that debtors could not have cured the checks during the time period in question because their financial affairs were in disarray. District Court Transcript at 65-67. Thus, a standstill would have had no practical effect on debtors' ability to cure the checks. Debtors' counsel[11] may have advised them that it was unnecessary to cure the checks, but absent some evidence that Amoco agreed to this, the cure period was not tolled.
 
 
 74
 The question of estoppel is a closer one. Equitable estoppel does not depend on an agreement between the parties. Under Wisconsin law,
 
 
 75
 [t]he defense of equitable estoppel consists of action or non-action which, on the part of one against whom estoppel is asserted, induces reliance thereon by the other, either in action or non-action, which is to his detriment.... It is elementary, however, that the reliance on the words or conduct of the other must be reasonable ... and justifiable ....
 
 
 76
 Kohlenberg v. American Plumbing Supply Co., 82 Wis.2d 384, 396, 263 N.W.2d 496, 501 (1978) (citations omitted). Here, we agree with the district court that Amoco did nothing to induce reasonable reliance by debtors on a tolling of the cure period. Debtors may have relied on their counsel's advice, but that is no basis on which to estop Amoco.[12]
 
 E.
 
 77
 Debtors argue that even if the dealerships were terminated before they filed for bankruptcy, they can assume the contracts because the power to cure defaults under section 365 includes the power to revive an executory contract terminated pre-bankruptcy. Debtors cite DiPierro v. Taddeo, 685 F.2d 24 (2d Cir.1982), for the proposition that a debtor may cure and revive a contract.
 
 
 78
 Taddeo, however, is distinguishable. In Taddeo, debtors had defaulted on their mortgage payments. The mortgage holder accelerated the mortgage and instituted foreclosure proceedings. Before the holder could obtain a final judgment of foreclosure and sale, debtors filed a petition for relief under chapter 13. Under applicable state law, debtors could have avoided foreclosure by paying off the full amount of the mortgage. Thus, the contract had not been fully terminated pre-bankruptcy, in contrast to the situation in this case. See In re Clark, 32 B.R. 711 (W.D.Wis.1983).
 
 
 79
 Where a contract has been validly terminated pre-bankruptcy, the debtors' rights to continued performance under the contract have expired. The filing of a petition under chapter 11 cannot resuscitate those rights. See In re Triangle Laboratories, Inc., 663 F.2d at 467-68. Here, the dealership contracts were terminated and cannot be revived.
 
 F.
 
 80
 Debtors argue that the jobbership contract is assumable because they filed for bankruptcy before the expiration of the fifteen-day cure period allowed by the jobbership termination notice. Thus, according to debtors, the contract was executory at the time of filing. Under section 365(d)(1), debtors may assume an executory agreement at any time before confirmation of the plan. Debtors contend that therefore the jobbership is still assumable.
 
 
 81
 Amoco argues that under section 108(b) of the Code, debtors had only sixty days from the date of filing to cure the default. Because debtors failed to cure within the sixty days, Amoco argues that debtors may no longer assume the contract.
 
 
 82
 The bankruptcy court held that section 108(b) controlled and thus, debtors would have had to cure the default within sixty days if they wanted to assume the contract. The district court did not separately address the issue.
 
 
 83
 Section 365[13] provides that the debtor may assume or reject an executory contract at any time before confirmation of the plan. 11 U.S.C. Sec. 365(d)(2). If there has been a default under the contract, the debtor must cure the default at the time of the assumption. 11 U.S.C. Sec. 365(b)(1)(A). This court has summarized the policy behind section 365 as follows:
 
 
 84
 Since a debtor is in limbo until confirmation of a plan, it is understandably difficult to commit itself to assuming or rejecting a contract much before the time for confirmation of a plan.... This procedure insures that the debtor is not in the precarious position of having assumed a contract relying on confirmation of a particular plan, only to find the plan to have been rejected.
 
 
 85
 Data-Link Systems, Inc. v. Whitcomb & Keller Mortgage Co., 715 F.2d 375, 378 (7th Cir.1983) (quoting unpublished bankruptcy order of April 8, 1981).
 
 
 86
 Section 108(b)[14] provides in part that where an agreement fixes a time period in which the debtor may cure a default, the debtor may cure before the later of the expiration of the time period or sixty days after the filing of the petition. We hold, however, that section 108(b) does not apply to curing defaults in executory contracts. Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here. See In re McLouth Steel Corp., 20 B.R. 688 (Bkrtcy.E.D.Mich.1982).[15] At the time debtors filed their petition, the time for cure had not expired. The contract was still executory. See In re Easthampton Sand & Gravel Co., 25 B.R. 193, 197 (Bkrtcy.E.D.N.Y.1982). Under section 365(a), debtors may still elect to assume the contract. If debtors ultimately determine to assume it, they may cure the default at any time prior to the assumption, pursuant to section 365(b)(1)(A).
 
 
 87
 This holding is consistent with the policies underlying the different provisions and the Code in general. The purpose behind section 108(b) is to permit the debtor an extension of time for doing certain acts necessary to preserve his rights. It would be anomalous to apply it to restrict debtors' rights, as Amoco would have us do here. Applying section 108(b) here would force debtors to decide whether to cure long before they must decide whether to assume or reject the contract and long before they know whether any reorganization plan will be confirmed. Finally, the purpose behind chapter 11 is "to permit successful rehabilitation of debtors" and "to prevent a debtor from going into liquidation." NLRB v. Bildisco & Bildisco, --- U.S. ----, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). Debtors must be permitted a certain amount of flexibility in determining whether to assume or to reject a contract. Specific provisions of the Code should be interpreted with this goal in mind. To interpret the Code so as to minimize flexibility and rush the debtor into what may be an improvident decision does not further the purposes of the reorganization provisions.
 
 
 88
 We emphasize that this holding does not leave the other party to the contract without remedy until the time for confirmation of the plan. A party who cannot afford the uncertainty during the pendency of the reorganization may request the bankruptcy court to order the debtor to decide whether to assume or reject the contract within a specified period. 11 U.S.C. Sec. 365(d)(2).
 
 IV. The PMPA
 
 89
 Debtors argue that they are entitled to a preliminary injunction under the PMPA prohibiting Amoco from terminating the contracts pending a trial on the merits of their claim. Debtors argue that the terminations were for technical or unimportant reasons and for a cause beyond their reasonable control, in violation of the PMPA. Thus, debtors contend, they have raised a serious question as to the merits of their claim, which is the standard required by the PMPA for the granting of preliminary relief.
 
 
 90
 Amoco argues that debtors' failure to cure the dishonored checks was not technical or unimportant and was not beyond debtors' reasonable control. Amoco maintains that therefore debtors have not met the standard required by the PMPA for a preliminary injunction.
 
 
 91
 Section 2805(b)(1) of the PMPA provides that the court "shall" grant a preliminary injunction where "there exists sufficiently serious questions going to the merits to make such questions fair ground for litigation" and the balance of hardships favors the franchisee. Section 2802(b)(2)(C) permits a franchisor to terminate a franchise for "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination ... is reasonable ...." This power is limited by section 2801(1)(B)(13), which provides that a failure under the PMPA does not include one that "is only technical or unimportant to the franchise relationship" or is "beyond the reasonable control of the franchisee."
 
 
 92
 The franchisee's burden of proof for receiving a preliminary injunction under the PMPA is not a heavy one. In contrast to rule 65 of the Federal Rules of Civil Procedure, which requires a movant to show a strong or reasonable likelihood of success, the PMPA requires only that a franchisee show a reasonable chance of success on the merits. See Wojciechowski v. Amoco Oil Co., 483 F.Supp. 109, 114 (E.D.Wis.1980); Saad v. Shell Oil Co., 460 F.Supp. 114, 117 (E.D.Mich.1978).
 
 
 93
 Our review of the district court's refusal to grant a preliminary injunction is a narrow one. This court will not reverse a district court's grant or denial of a preliminary injunction absent a clear abuse of discretion by the district court. See Martin v. Helstad, 699 F.2d 387, 389 (7th Cir.1983). Thus, this court must decide whether the district court abused its discretion in determining that there was not a serious question as to whether the terminations were lawful under the PMPA.
 
 
 94
 Section 2802(c) provides examples of relevant events for which termination is reasonable. It includes "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled." Financial distress, the reason given by Amoco for the terminations here, is not listed. Congress, however, did not intend the list to be exclusive; other events may serve as grounds for termination. S.Rep. No. 731, 95th Cong.2d Sess. 38, reprinted in 1978 U.S.Code Cong. & Ad.News 893, 896. Courts must carefully scrutinize grounds that are not listed to make certain that the statutory standard of relevance and reasonableness has been met. Id.
 
 
 95
 In determining whether the ground relied on for termination is proper under section 2802(b)(2)(C), we must look to the purposes of the PMPA. Brach v. Amoco Oil Co., 677 F.2d 1213 (7th Cir.1982). In Brach, this court found that Congress, in enacting the PMPA, sought to protect franchisees from arbitrary terminations and nonrenewals while allowing franchisors to exercise reasonable business judgment. Section 2802(b)(2)(C) helps maintain that balance by allowing termination for unforeseen yet reasonable grounds. Id. at 1230. This court held that the section must be given a narrow construction "consistent with its overriding purpose to protect franchisees." Id. at 1221. "Events in the nature of contract violations must be assessed by an independent analysis of reasonableness and materiality." Id. This test is equivalent to the statutory requirement that termination cannot be for a failure that is for technical or unimportant reasons or for reasons beyond the franchisee's control.
 
 
 96
 Financial distress is certainly relevant to the franchise relationship. The PMPA is designed to protect franchisees against arbitrary terminations. A termination for financial distress is not arbitrary. A contractual provision is reasonable if it "has a basis in common sense and experience and is not unconscionable." Brach v. Amoco Oil, 677 F.2d at 1223 (citations omitted). The fact that the PMPA permits termination for failure to make timely payment recognizes that the franchisee's duty and ability to pay are central to the franchise relationship.
 
 
 97
 Debtors argue that their failure to cure the dishonored checks was technical and unimportant because the checks were for a small amount compared to the total amount of their business. This ignores the fact that debtors had owed Amoco a large sum on the jobbership for some time. Under the facts of this case, Amoco's decision to terminate the contracts was an exercise of its business judgment. We cannot substitute our business judgment for that of the franchisor. Brach v. Amoco Oil, 677 F.2d at 1223. Debtors' giving of a number of dishonored checks, coupled with the substantial arrearages under the jobbership contract, is not technical or unimportant.
 
 
 98
 Similarly, the failure to cure the checks was not beyond debtors' reasonable control. We have already determined that debtors had no reasonable basis to believe that their duty to cure within five days had been tolled. Moreover, the district court found that debtors had the ability to cure the checks within the five-day period. Debtors have not demonstrated that this finding of fact is clearly erroneous.
 
 
 99
 Because debtors have not shown the existence of a serious question on the merits of their claim, we need not discuss whether the balancing of hardships would favor debtors. Debtors have not shown an abuse of discretion in the denial of a preliminary injunction.
 
 V.
 
 100
 In summary, we reverse the district court's holding that the PMPA claims are not a related proceeding. The district court must enter final judgment on those claims. We also reverse the holding that debtors may not assume the jobbership contract. We affirm the remainder of the district court's opinion, and we remand this case for further proceedings consistent with this opinion.
 
 
 101
 Affirmed in part, reversed in part, and remanded.
 
 
 102
 TERENCE T. EVANS, District Judge, dissenting.
 
 
 103
 Although Judge Flaum's opinion is meticulous and his reasoning persuasive, the subject matter of this appeal, things like the assumability of certain jobbership contracts under the Petroleum Marketing Practices Act, is rather dry. Accordingly, rather than further burden the weary reader with a long dissent, I simply note, without expansion, that I believe that the district court was correct when it held that the debtors could not assume the jobbership contract. In addition, I believe that under the facts of this case the seeking of injunctive relief under PMPA is so inextricably tied to the creation of the estate in bankruptcy that it compels the conclusion that it is not a related proceeding within the meaning of the interim rule. Thus, I would affirm all aspects of the proceedings conducted below.
 
 
 
 *
 The Honorable Terence T. Evans, United States District Judge of the Eastern District of Wisconsin, sitting by designation
 
 
 [1]
 As to Oakdale, debtors hold title to the land and the truck stop, gift shop, and restaurant improvements; Amoco holds title to the service station improvements. As to Mauston, Amoco holds title to the land and the truck stop, restaurant, and service station improvements. As to Tomah, debtors hold title to the land and the service station improvements. Amoco has not sought to terminate the dealership at Tomah
 
 
 [2]
 The Oakdale dealer lease was renewed in April 1981 for a term to run until June 30, 1984. The Mauston dealer lease was renewed in October 1982 for a term to run until May 31, 1985. The PMPA applies to the termination of these franchises. 15 U.S.C. Sec. 2802(b)(1) (1982)
 
 
 [3]
 On April 11, 1983, debtors brought an adversary proceeding against their bank, alleging wrongful closing of their account, unlawful setoff, and wrongful dishonor. That proceeding is not now before this court
 
 
 [4]
 See Meter Marketing Plan Rider p 5 to Dealer Supply Agreements, Bankruptcy Exhibit 1 ("[f]ailure of Dealer to make payment in cash when due or demanded shall entitle Amoco to suspend deliveries, to enter upon the premises and lock the dispensing equipment pending removal of its products ...")
 
 
 [5]
 At all times, Amoco has held a $22,100 cash security deposit from debtors pursuant to the dealership agreements. Amoco elected not to apply this deposit to satisfy the dishonored checks. Amoco has stated that the purpose of the deposit is to protect Amoco's interest in the gasoline in the dealer's tanks. Amoco states that a dealer must have a security deposit with Amoco in order to receive any products. Amoco has asserted that if it had applied debtors' security deposit to cover the dishonored checks, it would have had to stop delivering products to debtors. Appellee's Brief at 8-9
 
 
 [6]
 Debtors also raised several issues under the Wisconsin Fair Dealership Law, Wis.Stat. Secs. 135.01-.07 (1974 & Supp.1983). The bankruptcy court rejected their claims. Debtors have not appealed this ruling
 
 
 [7]
 On February 9, 1983, the bankruptcy judge held that the interim rule was unconstitutional and that therefore he had no jurisdiction over matters arising in post-December 24, 1982, proceedings. Debtors brought a mandamus action against the judge in the district court. On March 7, 1983, the district court held for debtors and ordered the bankruptcy judge to exercise jurisdiction according to the interim rule. Moody v. Martin, 27 B.R. 991 (W.D.Wis.1983)
 
 
 [8]
 The history of the interim rule is described in White Motor Corp. v. Citibank, N.A., 704 F.2d 254, 259-62 (6th Cir.1983)
 
 
 [9]
 Any indications that related proceedings are limited to actions by or against noncreditors contained in White Motor Corp. v. Citibank, N.A., 704 F.2d 254 (6th Cir.1983), and Salomon v. Kaiser, 722 F.2d 1574, 1582 (2d Cir.1983), are purely dicta
 
 
 [10]
 Any right to cure to prevent termination provided by the Wisconsin Fair Dealership Law, Wis.Stat. Sec. 135.04 (1974 & Supp.1983) has been preempted by the PMPA. See 15 U.S.C. Sec. 2806 (1982)
 
 
 [11]
 Debtors' counsel on appeal to this court did not represent them during the settlement negotiations with Amoco. Appellate counsel entered the case while it was pending before the district court, when the original counsel had to withdraw because of a conflict of interest
 
 
 [12]
 In re Bronx-Westchester Mack Corp., 4 B.R. 730 (Bkrtcy.S.D.N.Y.1980), relied on by debtors, is inapposite. In that case, the creditor expressly promised not to terminate a contract if the debtor did not file under chapter 11. The debtor did not file, and the creditor sent a notice of termination. The court held that the creditor was estopped to terminate the contract. In contrast, in this case Amoco made no promises, express or implied
 
 
 [13]
 Section 365 provides in pertinent part:
 (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--
 (A) cures, or provides adequate assurance that the trustee will promptly cure, such default; ...
 (d)(2) In a case under chapter 9, 11, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.
 Although Sec. 365 refers to a "trustee," in a chapter 11 reorganization proceeding a debtor-in-possession has the rights and powers and performs the functions of a trustee. 11 U.S.C. Sec. 1107(a) (1982).
 
 
 [14]
 Section 108(b) provides in pertinent part:
 [I]f applicable law, or an order entered in a proceeding, or an agreement fixes a period within which the debtor ... may file any pleadings, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of--
 (1) the end of such period ...; and
 (2) 60 days after the order for relief.
 
 
 [15]
 The bankruptcy court relied on In re Santa Fe Development and Mortgage Corp., 16 B.R. 165 (Bkrtcy. 9th Cir.1981), for the proposition that Sec. 108(b) applied in this case. Santa Fe, however, applied Sec. 108(b) to permit the debtor to make a payment to extend an escrow. The analysis did not deal with curing a default under an executory contract
 In Johnson v. First National Bank of Montevideo, 719 F.2d 270 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984), the court held that Sec. 108(b) rather than Sec. 362 controlled the time of expiration of a statutory period of redemption of a mortgage. Johnson is distinguishable. Section 362 does not explicitly provide a time limit for statutory periods of redemption, and thus there is no express conflict between Sec. 362 and Sec. 108(b). In contrast, Sec. 365 expressly provides a time limit for cure of defaults under executory contracts. We should not apply Sec. 108(b) so as to cause an irreconcilable conflict between the two sections. Id. at 278 (citing Bank of Commonwealth v. Bevan, 13 B.R. 989 (E.D.Mich.1981). We express no opinion as to whether the decision in Johnson is correct.