## In re DIVERSIFIED WASHES OF VANDALIA, INC., Debtor.

Bankruptcy No. 3–92–03063.

United States Bankruptcy Court, S.D. Ohio, W.D.

Oct. 6, 1992.

Ruth A. Slone, Dayton, Ohio, for debtor.

Roger J. Makley and Ronald S. Pretekin, Dayton, Ohio, for movant.

Ann Spiegel, Houston, Tex., for Shell Oil.

---

### ORDER TERMINATING AUTOMATIC STAY FOR SHELL TO TAKE APPROPRIATE ACTION

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court upon the Shell Oil Company's ("Shell") motion for relief from stay, the response of Diversified Washes of Vandalia, Inc. ("Diversified Washes") and the hearing held September 23, 1992. This proceeding arose in a case referred to this court by the standing order of reference entered in this district and is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G)—Motion to terminate the automatic stay.

The court is authorized to enter final judgment. The following decision constitutes the court's findings of fact and conclusions of law in accordance with Fed R.Bankr.P. 7052.

In arriving at its determinations, the court considered the demeanor and credibility of all the witnesses who testified, including Mark A. Thompson, Harley Ray Emmons, Jr., and Timothy Tye. The court also considered the exhibits admitted into evidence, including Shell's exhibits 1 through 17 and debtor's exhibits A through H. The court considered a series of citations to legal authorities which may be cited in abbreviated form hereafter. The citations are as follows: *White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*, 5 B.R. 112 (Bankr.M.D.Tenn.1980); *In re Tudor Motor Lodge Associates, LTD*, 102 B.R. 936 (Bankr.D.N.J.1989); *Creel and Sons, Inc.*, 927 F.2d 595 (4th Cir.1991); *Schokbeton Ind., Inc. v. Schokbeton Products Corp.*, 466 F.2d 171 (5th Cir.1972) and *Long Term Disability Plan of Hoffman–*

*LaRoche, Inc. v. Hiler,* 99 B.R. 238 (Bankr. D.N.J.1989);

The issues presented for determination in this proceeding are whether Shell Oil Company is entitled to relief from stay under 11 U.S.C. § 362(d) and whether Shell Oil Company is entitled to a removal of the stay to complete the termination of its lease and dealer agreement with debtor.

## FACTS

Shell Oil Company is a franchisor of Diversified Washes of Vandalia, Inc., debtor. Harley Ray Emmons, Jr., is the prime principal of Diversified Washes, owning 90% of the corporate stock of debtor in possession. In 1990, Shell entered into a Motor Fuel Station Lease (Ex. 1) and a Dealer Agreement (Ex. 2) with debtor on June 15, 1990. The station lease and the dealer agreement each contained a provision requiring consent of Shell to any assignment or encumbrance of debtor's interest in the lease [1] and the dealer agreement.[2] The prohibition related to assignment, transfer or encumbrance of an ownership interest to others.

During 1991, Harley Ray Emmons, Jr., negotiated several stock purchase agreements of Diversified Washes for which he was paid in excess of $186,000 from five doctors and a bookkeeper. In November, 1990, he agreed to transfer a 10% interest (30 shares) to Homayoun Mesghali for $35,000 (Ex. 11). On April 25, 1991, he received $23,333 for transfer of twenty shares of Diversified Washes to Robert Orosz. Also in April, 1991, he received $70,000 from Kenneth A. Welty, Jr., for 70 shares (30% interest) of Diversified Washes (Ex. 13), the sum of $23,333 for 20 shares of the Diversified Washes stock from Robert Jasper (Ex. 14), and the sum of $35,000 from John Lochner for 30 shares of Diversified Washes stock. Earlier he had agreed to sell an interest in the corporation to Pat Dozier, a bookkeeper, for $15,000.

At the time Diversified Washes acquired the lease and dealer agreements from the former dealer, Harley Ray Emmons, Jr., reported that he and Danny L. Reveal each

---

**1.** Motor Fuel Station Lease

Article No. 9.1 *General.* This lease is personal to Lessee. Except as otherwise provided in this article 9 or by law, Lessee shall not assign or encumber any of Lessee's interest in this Lease or in the Premises, or sublease all of any part of the Premises, or permit any other arrangement having similar effect of such an assignment or sublease, or permit any other person to occupy or use all or any part of the Premises, either voluntarily, involuntarily or by operation of law, without Shell's prior written consent, which consent shall not be unreasonably withheld. Each request for Shell's consent to any assignment, encumbrance or sublease shall be submitted in the manner specified for notices in article 13.1, and Shell shall have 60 days (or any lesser period specified by law) following its receipt of all qualification information reasonably required by it in which to grant or withhold its consent in writing. No consent to any assignment, encumbrance or sublease shall constitute a waiver of the provisions of this article as to any such future transaction. Any assignment, encumbrance or sublease made without Shell's prior written consent or otherwise in violation of this Lease shall be null and void.

**2.** 17.1 *General.* This Agreement is personal to Dealer. Except as otherwise provided in this article 17 or by law, Dealer shall not assign or encumber any of Dealer's interest in this Agreement, or assign any claim against Shell arising directly or indirectly out of or in connection with this Agreement, or permit any other arrangement having similar effect of such an assignment or encumbrance, either voluntarily, involuntarily or by operation of law, without Shell's prior written consent, which consent shall not be unreasonably withheld. Each request for Shell's consent to any assignment or encumbrance shall be submitted in the manner specified for notices in article 22.1, and Shell shall have 60 days (or any lesser period specified by law) following its receipt of all qualification information reasonably requested by it in which to grant or withhold its consent in writing. No consent to any assignment or encumbrance shall constitute a waiver of the provisions of this article as to any such future transaction. Any assignment or encumbrance made without Shell's prior written consent or otherwise in violation of this Agreement shall be null and void.

17.2 *Particular Acts.* Without limitation, each of the following acts shall be considered an assignment subject to article 17.1: ...

(f) If Dealer is a corporation, any dissolution, merger, consolidation or other reorganization, or other arrangement having similar effect, or the sale or transfer by Dealer or any shareholder of 10% or more of the voting shares of the capital stock of Dealer or of any lesser interest which cumulatively vests 10% or more of such voting shares in the transferee.

owned 50% of Diversified Washes. While this information was not true, Harley Ray Emmons, Jr., considered the inaccuracy to be inconsequential. However, during 1990 and 1991, Shell received information which caused its representatives concern over the actual ownership interests in Diversified Washes which was acting as Shell's dealer during 1990. Mr. Emmons explained that Reveal would have become an owner but the contemplated deal never was completed. Later actions showed Shell placed great importance upon its knowledge of the ownership of Diversified Washes.

Mark Thompson, a Shell representative, learned from a former bookkeeper employee of the Diversified Washes, Pat Dozier, that she had invested $15,000 in Diversified Washes, without receiving any evidence of the investment. She threatened to report the transaction to a television station to embarrass Shell. During 1990, the Shell district manager wrote Harley Ray Emmons to require him to disclose the ownership interest in Diversified Washes (Ex. 7). In response to that request Mr. Emmons reported in a Certificate of Ownership dated January 19, 1992, that he owned 90% of the stock and H. Mesghali owned 10% of Diversified Washes. Mr. Emmons contends that he notified Shell verbally of the transfers to the other doctors during 1991.

Harley Ray Emmons, throughout the year 1991 and 1992, withheld disclosure of the large sums of money he had received for the transfer of shares in Diversified Washes from the four prospective shareholders in the purchase agreements of April, 1991. He contends that his receipt of the $186,000 from the four investors was not an assignment or an encumbrance of his stock nor that it was a change in ownership of Diversified Washes. He contended that the assignment was incomplete based on the provision in the Stock Purchase Agreement, Article 5 which reads:

5. The sale of shares hereunder shall not be completed until such transfer has been approved by the Ohio Department of Liquor Control.

He made no reference to Article 2 of the same agreement that:

[T]he sum to be paid for the common stock was payable in cash within seven days after all restrictions on transferability of the stock have been removed as hereinafter provided.

Neither Mr. Emmons nor Dr. Welty explained why the consideration was paid before the restrictions were satisfied, nor did they refer to the Shell consent under the provisions of the Lease and Dealer Agreement.

Shell learned of the potential transfers to the four investors during early 1992. On March 31, 1992, Shell sent a notice of termination to Harley Ray Emmons to be effective July 10, 1992, for Mr. Emmons' alleged failure to comply with Article 9 of the Lease and Article 17 of the Dealer Agreement. Shell considered those provisions reasonable and of material significance to the franchise relationship in conformance with the Petroleum Marketing Practices Act (15 U.S.C. § 2802(b)(2)(A)). As a further ground for termination, Shell also stated the untruthful information about the current identity of the shareholders of Diversified. Shell contended that Mr. Emmons failed to exert a good faith effort to carry out the provisions of the franchise relationship under the Petroleum Marketing Practices Act, § 2802(b)(2)(B).

## CONCLUSIONS OF LAW

It has not been contested that the franchise rights of the debtor constitute property of the estate pursuant to § 541 of the Bankruptcy Code. The rights of the franchisee are governed by the Motor Fuel Station Lease and the Dealer Agreement between Shell and Diversified Washes.

 The first issue in this matter is whether at the filing of this chapter 11 case the debtor's estate had anything more than the rights of the debtor under the agreements with Shell. The automatic stay under 11 U.S.C. § 362 of the Bankruptcy Code prevented the franchisor, Shell, from effectively completing termination of the agreements on July 10, 1992, a date ten days after the filing of the chapter 11 case. However, the automatic stay does not prevent the mere running of time under a

contract. In a similar case involving the termination of a franchise contract when a chapter 11 case was filed before the effective date of termination, the court in the case of *In re Tudor Motor Lodge Assoc. Ltd Partnership*, 102 B.R. 936 (Bankr. D.N.J.1989), considered similar issues to those before the court in this case. That court quoted *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir.1984) *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 as follows:

> [T]he filing of the chapter 11 petition cannot expand debtor's rights as against Amoco. *Schokbeton Ind., Inc. v. Schokbeton Products Corp.*, 466 F.2d 171, 176–77 (5th Cir.1972) [additional citation omitted]. When the termination notice was sent, debtors only had a right to ninety days' worth of dealership contracts. The filing of the petition does not expand that right. This conclusion is supported by a number of decisions in the Bankruptcy Courts. [citations omitted].

Similarly, § 541(a) provides that a debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of a case." Thus, whatever rights a debtor has in property at the commencement of a case continue in bankruptcy—no more, no less. Section 541 "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case." H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787.

Section 362, which creates an automatic stay of certain creditor actions upon the filing of a petition in the bankruptcy court, does not help debtors here. The automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract. *See Johnson v. First National Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1015 [79 L.Ed.2d 245], (1984) [additional citations omitted]. Section 362 does not give a debtor greater rights in a contract. *Trigg v. United States*, 630 F.2d 1370, 1372 (10th Cir.

1980). Thus, debtors cannot rely on section 362 to prevent termination of the contracts.

734 F.2d at 1213.

Shell in this case issued a notice of termination on March 31, 1992, based upon violation of provisions of the lease and dealer agreement requiring consent of Shell to any transfers, assignments, or encumbrances on the ownership Diversified Washes, the dealer. Shell maintains that such information is imperative to its dealer relationship because of the importance to Shell of maintaining its image as a respected supplier of petroleum products. It is obvious to the court that Shell has an interest in knowing who its dealers are, and that its dealers are knowledgeable in the oil business, trustworthy, and able to manage a station as to cleanliness and respectful of environmental laws.

The court agrees with Shell that the withholding of information of clear significance to Shell's right to know who its dealers are is a reasonable ground for termination under the Petroleum Marketing Practices Act (15 U.S.C. § 2802(b)(2)(A) and (B)). Mr. Emmons' failure to respond to Shell's request truthfully and to explain such action by the technicality that the transfers had not been completed is unsatisfactory. The payment of $186,000 by several individuals was most certainly an encumbrance upon Emmons' ownership in Diversified Washes. He had the duty under his lease and dealer agreement to reveal the true ownership and to reveal his negotiations and acceptance of large sums of money for the transfer of his stock in Diversified Washes.

Shell's basis and grounds for the termination are reasonable and of material significance to the franchise relationship as required under the Petroleum Marketing Practices Act.

This court holds that the automatic stay does not prevent the time from running on the termination notice. The debtor in possession succeeded to the rights which Diversified Washes had in the franchise agreements. Those rights were burdened

with the approximately 120 day termination notice. The debtor in possession had only ten days of franchise rights as of the date of the filing of the petition in chapter 11. The automatic stay does not prevent that termination notice period from running.

Diversified Washes has offered no adequate protection or satisfactory proposal to Shell to prevent the termination of the lease and dealer agreement from being completed.

The automatic stay is ordered terminated for Shell to take appropriate measures to recover its station and terminate the dealer agreement.

IT IS SO ORDERED.