In re NASHVILLE WHITE TRUCKS, INC. (a/k/a Mobile Truck & Trailer Service, Inc.), Debtor.

WHITE MOTOR CORPORATION, Plaintiff,

v.

NASHVILLE WHITE TRUCKS, INC. (a/k/a Mobile Truck & Trailer Service, Inc.), Defendant.

Bankruptcy No. 380–00080.
Adv. No. 380–0213.

United States Bankruptcy Court, M. D. Tennessee.

June 20, 1980.

**114**

I. C. Waddey, Jr., Nashville, Tenn., for defendant.

Thomas J. Sherrard, William R. O'Bryan, Jr., Nashville, Tenn., for plaintiff.

## MEMORANDUM

PAUL E. JENNINGS, Bankruptcy Judge.

This matter is before the court upon complaint of the creditor White Motor Corporation for relief from the stay of 11 U.S.C. § 362 to permit termination of a lease and for a declaratory judgment concerning expiration of a dealer sales and service agreement with the debtor. The following shall constitute findings of facts and conclusions of law pursuant to Rule 752, F.R.B.P.

On or about January 30, 1978, plaintiff White Motor Corporation (hereinafter White) and defendant Nashville White Trucks, Inc. (hereinafter debtor or NWT) entered into a Dealer Agreement, appointing the latter an authorized dealer for White trucks, accessories and parts. The contract required the debtor to maintain certain working capital (Section B.1), to submit to White monthly financial statements (Section B.3), to carry in stock an adequate inventory of unassigned new trucks and an adequate inventory of accessories and parts (Section B.4). Under Section B.1 the dealer was not permitted to change location without the prior written consent of White. The contract also provided for termination at any time by mutual consent of the parties, for termination by either party upon thirty days notice, or for termination upon the happening of certain specified events (Section D.1). Section E.9 provided that the agreement was to continue in effect for a period of two years and to end on January 29, 1980, unless sooner terminated by either party as provided in D.1 and D.2; upon the expiration date the agreement was to terminate automatically without notice.

On or about June 1, 1978, White and the debtor entered into a lease agreement covering certain improved real property at 1321 Foster Avenue, Nashville, Tennessee, for a period of five years commencing June 1, 1978, and ending May 31, 1983. These premises were to be used for the sale, service and storage of motor vehicles (section 5). The agreement also provided for termination of the lease by thirty days written notice upon termination of the dealer selling agreement. Section 24 prohibited subletting or assignment of the lease without the prior written consent of the lessor which was not to be unreasonably withheld.

Problems between White and the debtor developed almost immediately. Payments on the lease were routinely late. Testimony at trial revealed that between June, 1978, and the present, NWT has been delinquent in lease payments a total of 365 days. Exh. 1. Because of delinquencies in payment on open account for parts, NWT was put on a cash basis in November, 1978, and has continued on such to date. The required monthly financial statements were not submitted regularly; there was a gap from August, 1978, to July, 1979, except for a December, 1978, audited statement prepared in September, 1979. Exh. 4. NWT did not have a floor plan arrangement after May, 1979. Prior to that date NWT was found to be substantially out of trust. This matter was resolved between the parties and NWT was allowed to repay the amount over a period of months. Working capital requirements as originally proposed were not met. A number of cash advances were made by NWT to the principals of NWT and to other corporations owned by them.

In an effort to work out these problems, the parties held a number of meetings in late 1979. A meeting in September result-

ed in a plan of action to be taken by NWT to be reinstated on open account for parts purchases. Another meeting on October 17, 1979, was attended by T.G. Wilson and W.J. Wilson, president and vice-president of NWT respectively, George Kenyon, vice-president for the Southeastern Region of White, George Flynn, Regional Business Manager for White, and John Hill, District Sales Manager for White. At that time the parties agreed to have arrangements completed for establishing open account and wholesale finance accommodations by December 1, 1979.

At the September meeting the Wilsons had agreed to take certain action to improve the financial picture of NWT. Included were the sale of a Black Angus herd, sale of land owned by Cedarmont Farm, Inc., and sale of stock in Harpeth Savings and Loan. Proceeds of the various sales were to be used to pay off cash advances by NWT to the Wilsons and other corporations owned by them. During the fall the proposed sale of the cattle was held, resulting in the payment of approximately $130,000 to NWT, clearing some of the accounts in question from the books. Sale of a substantial portion of the Farm was accomplished but did not produce a surplus above the amount of the various mortgages; sale of the remaining portion of the Farm has not been made. Sale of the saving and loan stock was blocked by inability to obtain federal approval.

A meeting was held on December 3, 1979, attended by W.J. Wilson, Kenyon and Hill. During that meeting Wilson saw the 1980 marketing plan prepared by Hill in which he recommended among other things replacement of the dealer unless all areas of dealer operations were improved. Wilson's reaction was one of indignation and subsequent discussions were cut off. Wilson testified Hill was unable or unwilling to explain the basis of that recommendation or even the production goals which were being proposed. Having heard the testimony of Mr. Hill the court understands Mr. Wilson's testimony. Mr. Hill was either unable or unwilling to answer questions presented at trial. His testimony was of no benefit in this trial.

The parties met again on December 10, 1979. This meeting was attended by W.P. Holzworth, Director-Dealer Operations, and Ed Knoll, Manager of Dealer Financial Development. Holzworth testified that the purpose of the meeting was to discuss the failure of NWT to achieve the objectives set in the October meeting and pursue possible remedies. Wilson stated that he interpreted the visit by the White officials to be conciliatory in nature since the December 3 meeting had been heated. Wilson stated that Holzworth assured him at this meeting that the termination of the dealership would not occur. Holzworth testified that he assured Wilson that the termination would not occur IF the problems identified during the series of meetings were worked out. Holzworth also offered his help in attempting to set up wholesale financing with White Motor Credit Corporation but was not successful. From testimony the court concludes Wilson properly perceived the purposes of the meeting and was probably justified in concluding there was no immediate concern as to cancellation. White never advised a cancellation was forthcoming unless NWT corrected the problem areas. Clearly, Hill had not so informed NWT as he is totally incapable of making such a positive statement in a face to face discussion.

On January 5, 1980, an interoffice telegram was sent by Holzworth to Kenyon reading "Nashville Tennessee dealers sales and service agreement expires on January 29, 1980. Please advise this office as to the desired renewal term in order for us to send out the pages for signature." At trial Holzworth stated that the inquiry was made by clerical personnel in the office in a routine checking of expiration dates and not at his personal direction.

On January 10, 1980, NWT filed a voluntary petition in bankruptcy. W.J. Wilson notified White of the filing. On January 14, White initiated the "Request for Prior Approval Cancellation of Dealer Sales and Service Agreement." The request stated

that the termination was desired because of "D(c)(3)", referring to the paragraph in the Dealer Agreement which allows White to terminate upon the institution of involuntary or voluntary bankruptcy proceedings. The request also summarized the history of the dealership and the problems incurred.[1]

The proof is positive that the regional office has an important role in determining whether there is to be a franchise renewal. Indeed the testimony is that this recommendation is accepted by the home office. The testimony of Kenyon is that the operation of NWT was of continuing concern to White and that no decision to renew or revoke the franchise was finally made until early January. The parties testified that franchise relationships were designed to be continuing and were cancelled only as a last resort.

The indecision of White is reflected by the response to the Holzworth telex. Receipt of the telex resulted in Kenyon's office contacting Holzworth and in effect saying—it is not a renewal term that is needed but a determination of whether there is to be a renewal.

White has filed a complaint for relief from the automatic stay of § 362 to permit termination of the lease and for a declaratory judgment concerning expiration of the dealer agreement. Trial was held May 15, 16 and 23. Testimony by White concentrated on the problems outlined previously. Additionally there was testimony as to the failure of NWT to meet assigned quotas.

Each of the witnesses for White testified that the failure to meet quotas, lack of a floor plan arrangement or lack of open account for parts would not individually constitute sufficient reasons for termina-

tion of the agreement. The evidence does not establish that either the sales or the service provided by NWT was inadequate or unsatisfactory. Testimony by NWT concentrated on the efforts by the Wilsons to achieve the identified objectives, the assurances by White officials during the various visits and the documents stating the reason for the termination to be the filing of bankruptcy January 10.

■ An attempted termination of a contract because of bankruptcy is ineffective. 11 U.S.C. § 365(e) provides that an executory contract or lease of the debtor may not be terminated or modified "at any time after the commencement of a case solely because of a provision in such contract or lease that is conditioned on (A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement."

■ An executory contract or unexpired lease may be assumed. It is a fundamental concept that the assumed contract or lease is accompanied by all its provisions and conditions. *Atchison, Topeka & Santa Fe Ry. Co. v. Hurley*, 153 F. 503 (8th Cir. 1907) aff'd 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909). Thus, a contract may be assumed subject to all its limitations, one of which is obviously the expiration date.

In the instant case it is clear that White could not terminate the franchise under the existing contract solely on the basis of the bankruptcy. It is apparent that the relationship had been plagued by problems

---

**1. REASON:**

Nashville White Trucks, Inc., filed a petition in bankruptcy (Chapter XI–Reorganization) on January 10, 1980. The dealer has been on a cash basis for parts purchases since November, 1978 and without a new truck floor plan source since May 1979,. as a result of an out-of-trust situation with White Motor Credit Corporation. Due to these financial complications, this dealer purchased only 25 new trucks and $162,000 parts from White in 1979 versus 66 trucks and $198,000 parts in 1978. The added stigma of

bankruptcy will certainly make it increasingly difficult for the dealer to perform his selling agreement obligations and our market position is croding rapidly. We have previously received complaints from one of our major customers regarding this dealer's inability to stock an adequate supply of parts and it is in our best interests in this market to replace this dealer at the earliest possible date. Exh. 14. (Request for Prior Approval Cancellation of Dealer Sales and Service Agreement.)

from its inception and that collectively these problems could have furnished grounds for termination long before the filing of the bankruptcy petition. It is also clear that the unexpired term of the contract (January 10–29) could have been assumed by NWT.

The parties have placed emphasis on whether the decision to terminate was the result of filing the bankruptcy. The exact time White determined to cancel is difficult to determine but the court, for reasons hereinafter stated, does not find it to be critical. Additionally, as shown by the facts, it cannot be logically argued that bankruptcy was the cause of termination. Numerous other factors existed and bankruptcy simply added to the stack. At most it was the event that triggered a final decision.

■ The assumption or rejection of executory contracts and leases allowed by the Bankruptcy Code is a unique power given to facilitate the rehabilitation of debtors. The Code does not, however, grant the debtor in bankruptcy greater rights and powers under the contract than he had outside of bankruptcy. The court finds nothing in the Code which enlarges the rights of NWT under the contract or which prevents the termination of the contract on it own terms on January 29, 1980.

■ Having reached that point, however, the court must determine what rights and interests the parties had after the January 29, 1980, expiration date. The court finds no state or federal law which gives the debtor rights to performance by White after the expiration date of the contract. 15 U.S.C. § 1221–1225, the Automobile Dealer Franchise Act, creates a cause of action for wrongful termination of a dealer by a manufacturer. The statute provides for recovery of damages when the manufacturer has used coercion or intimidation in his dealings with the dealer. The statute may not be used, however, to force continued dealings between the parties. *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (6th Cir. 1976); *Overseas Motors, Inc. v. Import Motors Ltd., Inc.*, 519 F.2d 119 (6th

Cir. 1975), *cert. denied* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

■ T.C.A. § 55–17–114 allows the Tennessee Motor Vehicle Commission to revoke the license of a manufacturer who unfairly terminates or fails to renew the franchise of a motor vehicle dealer. It does not create a private cause of action or prohibit termination. T.C.A. § 47–19–101 requires the repurchase of inventory after termination of a franchise but provides no other remedy.

Having found no state or federal law which creates continuing rights in the Nashville dealership, the court must next determine whether a new contract arose by virtue of the conversations between the parties at any of the various meetings. It appears from the facts that White stated that a termination would not be forthcoming if NWT could correct their more serious problems. Emphasis was placed on the lack of open account for parts and lack of a floor plan arrangement. A number of other problem areas were discussed. As the expiration date of the contract approached, it became apparent that NWT was not going to be able to change those conditions.

Since the conditions outlined by White were not met by NWT by January 29, 1980, White was no longer bound to enter into the new contract. There was no unconditional promise to renew. Any acts taken by NWT can best be characterized as preliminary steps to improve the working capital problem; as such they are preparatory only and do not represent a substantial part of the requested performance by a party to the contract. Corbin on Contracts § 49 (1950); Williston on Contracts §§ 60A, 73 (3rd ed.)

Assuming arguendo that the conversations between NWT officers and White officials resulted in an oral contract to renew the dealership agreement, the court is forced to reach the same result. Such an agreement, although preliminary to the actual renewal, is not separate and distinct from the renewal of the dealer sales and service agreement to be executed later. By

the great weight of authority, an oral contract or agreement to enter into a written agreement which is within the scope of the Statute of Frauds is also within the Statute. *Union Car Advertising Co., Inc. v. Boston Elevated Ry. Co.*, 26 F.2d 755 (1st Cir. 1928); Annot. 58 A.L.R. 1015; *Patterson v. Davis*, 28 Tenn.App. 571, 192 S.W.2d 227 (1945), *cert. denied* (1946); 72 Am. Jur.2d Statute of Frauds § 4; 37 C.J.S. Statute of Frauds § 64. The rationale behind such a position is obvious.

> To allow the enforcement of such an agreement would be tantamount to taking the main contract out of the statute, and as has been said, it is absurd to say that an oral promise in relation to certain subject matter is invalid, but that a promise that the party will thereafter bind himself with respect to the subject matter is valid. Such a construction would be a palpable evasion of the statute and let in all of the evils against which it is directed. 72 Am.Jur.2d, Statute of Frauds § 4 at 568.

Thus, if the renewal contract is within the Statute of Frauds, the agreement to enter into the renewal contract falls within its protection as well. The determining factor seems to be the effect of the termination clause found in the original form contract used by the parties which provided for termination by either party at any time upon the giving of thirty days notice. Again the majority view seems to be that the fact that either of the parties may have the right to terminate a contract within a year does not take it out of the "operation of the statute, if, independent of the exercise of such a power, the agreement cannot be performed within a year." 72 Am.Jur.2d Statute of Frauds § 16 at 580. This position is consistent with that found in 37 C.J.S. Statute of Frauds § 48 and Williston on Contracts § 498A (3rd ed.). To the contrary, however, see Corbin on Contracts § 499 (1950).

While there are several Tennessee cases dealing with performances not to be completed within one year, none have been found in which the right of either party to terminate the contract has played a crucial role. In holding that an oral contract to do grading for a railroad was not within the Statute of Frauds, the Supreme Court of Tennessee stated that the Statute extends only to "contracts in which, by express appointment or understanding of the parties, the thing is not to be performed within a year." Later it added that such understanding "must appear either from the inherent nature of the contract, or from the words or actions of the parties at the time, that such an understanding was a part and parcel of the agreement itself." *Johnston v. Cincinnati, N.O. & T.P. Ry. Co.*, 146 Tenn. 135, 240 S.W. 429, 432 (1922). In a similar case where the parties had entered into a contract to remove gravel and supply it to a road contractor, the court found the agreement to be outside the Statute of Frauds since it could be performed within a year and repeated that the Statute extends only to contracts in which by express understanding of the parties the contract is not to be performed within one year. *Anderson-Gregory Co. v. Lea*, 51 Tenn.App. 612, 370 S.W.2d 934 (1963).

In applying the Statute of Frauds to an employment contract, the Supreme Court of Tennessee found an oral contract to employ a carpenter for three years to be within the statute notwithstanding the fact that death could have terminated the agreement within one year. *Dickens v. Tennessee Electric Power Co.*, 175 Tenn. 654, 137 S.W.2d 273 (1940). In that instance death acts to defeat the contract, not to complete it.

The *Boutwell* court applied the reasoning of the *Johnston* opinion, *supra*, and added:

> The question is not what the probable, expected, or actual performance of the contract may be, but whether, according to the reasonable interpretation of its terms, it requires that it should not be performed within the year. Unless the court, looking at the contract in view of the surroundings, can say that in no reasonable probability can such agreement be performed within the year, it is its duty to uphold the contract. *Boutwell v. Lewis Bros. Lumber Co.*, 27 Tenn.App. 460, 182 S.W.2d 1, 3 (1944).

■ Performance in the reasonable interpretation of the word contemplates full and complete performance. It is the opinion of the court that exercise of the termination right acts to defeat performance, and thus the contract, not to complete it. Accordingly, the court finds that the right of termination in the contract at issue does not act to take it out of the Statute of Frauds and that to be enforceable it must be evidenced by a written memorandum.

■ The memorandum required to satisfy the Statute of Frauds "presupposes a prior valid agreement, and meeting of minds, of the parties." 72 Am.Jur. Statute of Frauds § 290. It must show an existing and binding contract as distinguished from mere negotiations and must disclose the particular contract sought to be enforced. *Black v. Black*, 185 Tenn. 23, 202 S.W.2d 659 (1947). Such writing must contain all the essential terms and conditions of the contract. 2 Corbin on Contracts § 499 (1950). "Unless the writing, considered alone, expresses the essential terms with sufficient certainty to constitute an enforceable contract, it fails to meet the demands of the statute." Williston on Contracts § 575 (3rd ed.).

■ Letters or other memoranda are not sufficient "unless they amount to an acknowledgement by the party to be charged that he has assented to the contract that is asserted by the other party. If, when interpreted together, they show no more than preliminary negotiation suggesting terms to be later agreed upon, they are insufficient to establish a contract." 2 Corbin on Contracts § 517 (1950). It has also been stated that "a memorandum disclosing merely that a contract had been made, without showing what the contract is, is not sufficient to satisfy the requirement of the Statute of Frauds that there be a memorandum in writing of the contract." *Lambert v. Home Federal Savings and Loan Assoc.*, 481 S.W.2d 770, 773 (Tenn.1972).

Such memoranda may consist of separate writings if one of them is signed by the party to be charged and refers to others that supply the details. 2 Corbin on Contracts § 512 (1950). Telegrams and teletype messages are sufficient to satisfy the Statute. Williston on Contracts § 569 (3rd ed.). Letters, telegrams or other written communication by a party to a contract to his agent or to one who is not a party thereto, which sufficiently disclose the terms of the agreement and admit it or affirm it are valid memoranda to satisfy the Statute. *Lee v. Cherry*, 85 Tenn. 707, 4 S.W. 835 (1887); Annot. 112 A.L.R. 490.

■ Several documents may be relied on to satisfy the Statute if they clearly relate to each other and collectively make out the contract with all the terms. *Yates v. Skaggs*, 187 Tenn. 149, 213 S.W.2d 41 (1948); *Schultz v. Anderson*, 177 Tenn. 533, 151 S.W.2d 1068 (1941). Such memorandum must contain the essential terms of the contract expressed with such certainty that they may be understood without resort to parol. *Johnson v. Haynes*, 532 S.W.2d 561 (Tenn.App.1975). A term is essential if it seriously affects rights and obligations of the parties. *Ginsberg Mach. Co. Inc. v. J & H Label Processing Corp.*, 341 F.2d 825 (2d Cir. 1964).

■ In the instant case the court finds that the telex sent from the Holzworth office to Kenyon did not show an existing and binding contract but merely a routine inquiry preliminary to further discussions with the debtor. Assuming arguendo that such an agreement were found, the telex by its own terms raises the question of the number of years to be considered in the future association. Recognizing the troubled history of the relationship, the court certainly cannot make any assumptions as to what the parties would have decided. It is also to be noted that once the telex was received by the regional officials of White, all action possibly precipitated by the notice was stopped. Kenyon and Flynn promptly called Holzworth and informed him that the Southeast Region recommended non-renewal of the franchise. Holzworth agreed with the recommendation and instructed Flynn to prepare the documents for approval of non-renewal. Accordingly the court must

**120**

find that the telex and its reference to the dealer sales and service agreement do not evidence prior agreement or contract between the parties, do not supply all the essential terms, and thus do not act as sufficient memoranda to satisfy the Statute of Frauds.

The continued business relationship between the parties since the January 29, 1980, date has resulted from the uncertainty as to the legal status of the franchise under the provisions of the new Bankruptcy Code and not from any waivers on the part of White. 11 U.S.C. § 362 provides that the filing of a petition operates as a stay of any act by an entity to obtain possession of property of the estate or of property from the estate; the stay continues until such property is no longer property of the estate. Since the court has found that the debtor had no interest in the franchise after the January 30, 1980, expiration date, it is clear that the franchise was no longer property of the estate and that the stay provisions of § 362 no longer applied. Accordingly, the court finds that the automatic stay of § 362 terminated in regard to the franchise as of January 30, 1980, when the property ceased to be property of the estate. The lease agreement provided that it could be terminated by either party following thirty days written notice upon termination of the dealer selling agreement. The giving of such notice has been stayed by § 362. Having found no dealership interest remaining in the debtor after January 30, 1980, the court also finds that the lease terminated thirty days afterward on March 1, 1980.

An appropriate order will be entered.