**In re VYLENE ENTERPRISES, INC., Debtor.**

**VYLENE ENTERPRISES, INC.,**

v.

**NAUGLES, INC.**

**Bankruptcy No. LA 84–14659–SB. Adv. No. LA 85–4983–SB.**

United States Bankruptcy Court, C.D. California.

Aug. 13, 1986.

Marc Smith, Universal City, Cal. and Howard Mark Becker of Knapp, Petersen & Clarke, Universal City, Cal., for debtor.

William T. Rintala, Peter C. Smoot and Marjorie Lakin Erickson of Rintala, Smoot, Jaenicke & Brunswick, Los Angeles, Cal., for creditors.

## MEMORANDUM DENYING PRELIMINARY INJUNCTION

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. INTRODUCTION

This motion for a preliminary injunction is brought by Naugles, Inc. ("Naugles") to

prohibit the debtor Vylene Enterprises, Inc. ("Vylene") from infringing its federally registered trademarks and from otherwise unfairly competing with it. The grounds for the motion are that Vylene's ten-year franchise agreement with Naugles has expired according to its terms, and has not been renewed. Vylene opposes the motion on the merits, and argues in addition that in bringing the motion Naugles has violated the automatic stay of Bankruptcy Code § 362(a). For the reasons stated hereafter, the Court denies the motion for a preliminary injunction, on condition that Vylene pay interim franchise and rental fees to Naugles in the amount of $2,000 per month, beginning September 1, 1986.

The Court further holds that this litigation concerning the assumption of a franchise agreement belonging to the estate is a core proceeding, and that the motion is not in violation of the automatic stay.

## II. FACTS

Vylene filed the underlying first amended complaint on April 15, 1986 pursuant to authorization of the Court. Vylene asserts nineteen claims for relief, all arising out of the expiration and non-renewal of the franchise agreement. Naugles has filed a counterclaim for trademark violations, unfair competition, misappropriation of trade secrets and for possession of the real property under the sublease from Naugles. Naugles moves for a preliminary injunction on this counterclaim.

Vylene paid $25,000 to Naugles for a ten year franchise beginning on December 30, 1975 for a Mexican-type fast food restaurant in Long Beach, California. The franchise included a sublease of the property from Naugles. Vylene claims that its restaurant was the most successful Naugles franchise, and one of the most successful Naugles restaurants.

Naugles began business in 1971, and in 1975 it owned 12 restaurants, including the Long Beach restaurant franchised to Vylene. It subsequently expanded to 219 company-owned restaurants by late 1985. The Vylene franchise was the sole Naugles franchise until October, 1983, when Naugles franchised five more units. As of late 1985 all of its restaurants were company operated, apart from these six franchises and one unit under an area franchise.

Relations between the parties were apparently good until 1983, when Vylene fell behind in payments due under the franchise agreement. In February, in June and again in July, 1984 Naugles gave Vylene notices of termination of the franchise agreement. In response to the last of these notices, Vylene filed this Chapter 11 bankruptcy case on July 17, 1984. At the time, Vylene was four months behind in its payments under the franchise agreement. On August 24, 1984 Naugles gave notice that it intended not to renew the franchise upon its expiration on December 30, 1985.

Through various proceedings before this Court Vylene paid its delinquent franchise fees and was permitted to assume the franchise agreement through its expiration date of December 31, 1975. The issue of the renewal of the franchise was reserved for later determination.

On October 30, 1985 Vylene gave timely notice of its intent to exercise its renewal rights. On November 14, 1985 Deborah Greene, the owner and president of Vylene, met with Michael Mooslin, the president of Naugles, to discuss the terms and conditions of a renewal agreement. On November 20, 1985 Naugles responded with an offer to renew, and demanded a renewal fee of $104,522 and other terms that Vylene found unacceptable. The franchise renewal fee was based on the fee that Naugles was charging in 1983 for new franchises, which was the last time that it had offered any franchises. Although in 1983 Naugles was offering to finance a portion of the franchise fee, it declined to offer any financing arrangements to Vylene, "due to its uncreditworthy history."

On November 23, 1985 Naugles opened a new company-owned restaurant at a distance of approximately 1.4 miles from the Vylene location, which offered a new menu

with prices substantially below those of Vylene.

Deborah Greene sent letters to Naugles on December 8, 1985 and December 27, 1985 to protest the unfairness of the Naugles offer and to request a more reasonable renewal offer. After several further letters, on January 9, 1986 Naugles offered to reduce the franchise renewal fee to $80,-000, and to reduce slightly the rent demanded. Alternatively, it offered to purchase the franchise for $80,000 in cash.

There have been no further negotiations, and no renewal agreement has been reached. In consequence, Naugles has refused to accept rent and franchise payments from Vylene, and seeks to terminate the operation of the franchise. Vylene claims that it still has a right to renew the franchise.

### III. CORE VS. NONCORE

Neither party has made a formal motion for a determination as to whether this is a core proceeding, as defined in 28 U.S.C. § 157(b). However, the parties have argued this issue in their memoranda, and the Court treats the argument of the parties as a timely motion for determination of this issue under 28 U.S.C. § 157(b)(3), which provides:

> The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

Naugles argues that this is not a core proceeding, as defined in 28 U.S.C. § 157(b)(2).[1] Vylene, in contrast, argues that this is a core proceeding.

The consequence of the determination of whether a proceeding is a core proceeding is specified in sections 157(b)(1)[2] and (c)(1):[3] A bankruptcy judge

---

**1.** Section 157(b)(2) provides:

Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interest for the purposes of confirming a plan under chapter 11 or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annual or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

**2.** 28 U.S.C. § 157(b)(1) provides:

Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

**3.** 28 U.S.C. § 157(c)(1) provides:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

may hear and make a final determination in a core proceeding; in a noncore proceeding,[4] however, a bankruptcy judge must submit proposed findings of fact and conclusions of law to a district judge for a final order or judgment. The role of the bankruptcy court is succinctly described in *Production Steel, Inc. v. Bethlehem Steel Corp. (In re Production Steel, Inc.),* 48 B.R. 841 (M.D.Tenn.1985): .

> In noncore matters, the bankruptcy court acts as an adjunct to the district court, in a fashion similar to that of a magistrate or special master. In noncore matters, the bankruptcy court may not enter final judgments without the consent of the parties and its findings of fact and conclusions of law in noncore matters are subject to de novo review by the district court.... In contrast to the bankruptcy court's authority in noncore cases, the bankruptcy court may enter final judgments in so-called core cases, which are appealable to the district court. The standard for appeal of core matters of the district court is the same as in other civil matters appealed from the district court to the circuit courts of appeal. 28 U.S.C. § 158(c).

*Id.* at 844.

The division of responsibility by section 157(c)(1) between district courts and bankruptcy courts is based upon constitutional considerations (although perhaps not compelled thereby), pursuant to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). *Northern Pipeline* invalidated the statutory jurisdictional grant to bankruptcy courts, on grounds

obscured because there were four opinions, none of which commanded a majority of the Supreme Court. Section 157 was enacted in 1984 in response to the jurisdictional crisis of the bankruptcy courts resulting from the *Northern Pipeline* decision.

The United States Supreme Court has subsequently clarified its *Northern Pipeline* decision in *Thomas v. Union Carbide Agricultural Products, Inc.,* 473 U.S. —, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) where it characterized its *Northern Pipeline* holding as follows:

> The Court's holding in that case establishes *only* that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review (emphasis added).[5]

*Thomas* involved a challenge to a statutory arbitration procedure to fix the compensation for the Environmental Protection Agency's use of a pesticide manufacturer's data on the health, safety and environmental effects of a registered pesticide in reviewing a subsequent registration application for a similar product. The arbitrator's "findings and determination" were subject to judicial review only for "fraud, misrepresentation or other misconduct." *Id.,* 105 S.Ct. at 3339. The Supreme Court in *Thomas* found that this scope of review by an Article III court satisfied constitutional requirements.[6]

The Ninth Circuit, following *Northern Pipeline,* has held that a bankruptcy court

---

**4.** A noncore proceeding must be "otherwise related" to a bankruptcy case for a bankruptcy court to have jurisdiction over the proceeding at all. This principle applies the general rule that the jurisdiction of all federal courts is limited to what is constitutionally provided by Congress.

**5.** The concurring opinion of Justice Brennan, joined by Justice Blackman and Justice Marshall, in *Thomas* is even more clear: It states that the impact of *Marathon* was to require that bankruptcy courts be properly constituted adjuncts of the district courts. *Id.,* 105 S.Ct. at 3342. Because BAFJA reconstituted the bank-

ruptcy courts as adjuncts to the district courts, this cured the constitutional deficiencies of bankruptcy court jurisdiction.

**6.** *See, also, Commodity Futures Trading Commission v. Schor,* — U.S. —, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), where the Supreme Court upheld the jurisdiction of the Commodity Futures Trading Commission to adjudicate state law claims as a necessary incident to federal claims under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.,* where the standard of review was the "weight of the evidence."

lacks jurisdiction "to make final determinations in matters that could have been brought in a district court or a state court." *Lucas v. Thomas (In re Thomas)*, 765 F.2d 926, 929 (9th Cir.1985) (validating the interim rule referring bankruptcy cases from the district court to the bankruptcy court); *see, also, Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159, 162 (9th Cir.1986) (traditional state law contract claim is not a core proceeding).

■ The counterclaim in this adversary proceeding does not involve a traditional contract action arising under state law, which, under *Northern Pipeline* as interpreted by *Thomas*, cannot be treated as a core proceeding. This motion for a preliminary injunction is based upon Naugles' claim for trademark infringement. It thus involves the use of property, which section 157(b)(2)(M) designates as a core proceeding: In denying a preliminary injunction

herein, the Court is provisionally approving Vylene's continued use of Naugles' trademarks, and this proceeding thus falls within the literal language of section 157(b)(2)(M). *Reilly v. Nettie Lee Shops (In re Nettie Lee Shops)*, 49 B.R. 946 (Bankr.W.D.Va.1985).

Thus this is a core proceeding.

### IV. AUTOMATIC STAY

Vylene argues, in opposition to the motion for a preliminary injunction, that the motion is brought in violation of the automatic stay of Bankruptcy Code § 362(a), 11 U.S.C. § 362(a). Vylene contends that in order to terminate the franchise agreement, obtain possession of the property or obtain injunctive relief, Naugles must first obtain relief from stay.

Section 362(b) provides eleven exceptions to the automatic stay.[7] Naugles argues

---

7. Section 362(b) provides:

The filing of a petition under section 301, 302, or 303 of this title ... does not operate as a stay—

(1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

(2) under subsection (a) of this section, of the collection of alimony, maintenance, or support from property that is not property of the estate;

(3) under subsection (a) of this section, of any act to perfect an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(6) under subsection (a) of this section, of the setoff by a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency of any mutual debt and claim under or in connection with commodity contracts, as defined in section 761(4) of this title, forward contracts, or

securities contracts, as defined in section 741(7) of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, arising out of commodity contracts, forward contracts, or securities contracts against cash, securities, or other property held by or due from such commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency to margin, guarantee, secure, or settle commodity contracts, forward contracts, or securities contracts;

(7) under subsection (a) of this section, of the setoff by a repo participant, of any mutual debt and claim under or in connection with repurchase agreements that constitutes the setoff of a claim against a debtor for a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, arising out of repurchase agreements against cash, securities or other property held by or due from such repo participant to margin, guarantee, secure or settle repurchase agreements;

(8) under subsection (a) of this section, of the commencement of any section by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

that it qualifies under section 362(b)(10), which provides that the automatic stay does not apply to the recovery of property by a lessor after the termination of a non-residential lease. Because of the expiration of the franchise agreement, Naugles argues, this exception to the automatic stay applies.

■ For the reasons stated *infra*, the Court finds that the Vylene franchise has not expired for all purposes, and that section 362(b)(10) does not apply. The Court finds no other exception enumerated in section 362(b) applicable to this case. However, section 362 does not fully explicate the applicability of the automatic stay to adversary proceedings brought in the court where the bankruptcy case is pending.

Is an adversary proceeding in the bankruptcy court where the case is pending exempt from the automatic stay of section 362(a)? Bankruptcy Rule 7001 requires that a variety of proceedings in a bankruptcy court, including a proceeding to obtain an injunction or other equitable relief, be brought by adversary proceeding. Rule 7001 could in consequence be viewed to except such proceedings from the automatic stay. However, the bankruptcy rule is a rule of procedure, and does not have the power to change the substantive law of the applicability of the automatic stay.[8]

Not all adversary proceedings that can be brought against a debtor under Rule 7001 are exempt from the automatic stay. For instance, under Rule 7001(10) any proceeding to determine a claim or cause of action removed to a bankruptcy court is an adversary proceeding. However, a state court action to collect an account from the debtor, pending at the time a bankruptcy case is filed and subsequently removed to

the bankruptcy court, clearly would be subject to the automatic stay, and could not proceed in the bankruptcy court. Instead, the creditor would be required to file his claim under Bankruptcy Code § 501, and the claim would be processed under the claims procedure. In contrast, an adversary proceeding to determine the dischargeability of a debt, provided for under Rule 7001(6), clearly can be filed and prosecuted without obtaining relief from stay.

The legislative history of section 362 is silent on this subject, and provides no assistance in resolving this issue.

To resolve this issue, we must look to the policies behind the automatic stay. The automatic stay prohibits creditors from proceeding to collect debts from a debtor, except in the court where the bankruptcy case is pending, and pursuant to the rules and procedures for the payment of creditors therein. One of the purposes of the bankruptcy system is to provide for the orderly liquidation of a debtor's assets and the payment of his creditors, either from his assets or from his future income. *See* House Report No. 95–595, 95th Cong., 1st Sess. 340 (1977), 1978 U.S.Code Cong. & Ad.News 5963, 6297; Senate Report No. 95–989, 95th Cong., 2d Sess. 49 (1978), 1978 U.S.Code Cong. & Ad.News 5787, 5835. In the claims and property liquidation procedures, the bankruptcy system fundamentally deals with money and other assets of the debtor that have monetary value.

In contrast, an injunction does not involve monetary relief as such, because a party is entitled to an injunction only if money is not sufficient to compensate him for the damages he may otherwise suffer. *Younger v. Harris*, 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); 11 C. Wright & A. Miller, *Federal Practice &*

---

(9) under subsection (a) of this section, of the issuance to the debtor by a governmental unit of a notice of tax deficiency; or [sic]

(10) under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property.

(11) under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument.

8. Bankruptcy rules are authorized by 28 U.S.C. § 2075, which provides in part: "Such rules shall not abridge, enlarge or modify any substantive right."

*Procedure* 368–369 (1973). A party seeking an injunction against a debtor is normally seeking to restrict the debtor's conduct insofar as it may injure the moving party. The claims process, which deals only with the payment of creditors, is insufficient to provide such protection where it is warranted.

Furthermore, a party seeking an injunction is entitled to a forum in which his application can be heard. The entitlement of the moving party to a forum for the determination of his right to injunctive relief ought not to be dependent upon his qualification for relief from stay: A party seeking an injunction ought to have an absolute right to be heard.

 In consequence, the Court holds that an adversary proceeding against a debtor seeking an injunction, brought in the court where the bankruptcy case is pending, is not subject to the automatic stay, and that it may be heard by the bankruptcy court without obtaining relief from the automatic stay.

## V. PRELIMINARY INJUNCTION

Preliminary injunctions in adversary proceedings in bankruptcy court are authorized under Bankruptcy Rule 7065, which provides: "Rule 65 F.R.Civ.P. applies in adversary proceedings...." Thus, to qualify for a preliminary injunction, Naugles must meet the requirements of Rule 65 of the Federal Rules of Civil Procedure, as set forth in Ninth Circuit law.

### A. *Ninth Circuit Standard*

The standard for issuance of a preliminary injunction is defined by the Ninth Circuit as follows:

[T]he moving party [must] demonstrate ... *"either* a combination of probable success on the merits and a possibility of irreparable injury, or that serious questions are raised [on the legal merits of the claim] and the balance of hardships tips sharply in the moving party's favor." *Beltran v. Myers,* 677 F.2d 1317, 1320 (9th Cir.1982) (emphasis in original). The

tests are "not separate," but represent the "outer reaches of 'a single continuum.' " [Citations omitted]. At no point in the continuum is the Court "bound to decide doubtful or difficult questions of law." ... "[T]he relative hardships to the parties" is the "critical element" in deciding when a stay is justified.... Finally, the public interest is a factor to be strongly considered in [appropriate] cases....

*Lopez v. Heckler,* 725 F.2d 1489, 1498 (9th Cir.1984), *reversed and remanded on other grounds,* 469 U.S. 1082, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984).

### B. *First Formulation of Standard*

Under the first formulation of this standard, Naugles must show a likelihood of prevailing on the merits and a possibility of irreparable injury.

#### 1. *Irreparable Injury*

The Court has no doubt that Naugles would be irreparably injured by Vylene's continued use of Naugles' trademarks, if in fact the franchise has terminated and Vylene has no renewal rights. Such unauthorized use of Naugles' trademarks would violate both the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and California trademark law. *See, e.g., Culligan International Co. v. Culligan Water Conditioning,* 563 F.Supp. 1265, 1269 (D.Minn.1983) (Lanham Act); *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 351 (9th Cir.1980) (California law and Lanham Act). This will support a preliminary injunction, if Naugles can make a showing of probable success on the merits.

#### 2. *Likelihood of Prevailing on Merits*

 The automatic stay of section 362 did not extend the December 31, 1985 expiration date of the Vylene franchise. *Lauderdale Motorcar Corp. v. Rolls Royce Motors, Inc. (In re Lauderdale Motorcar Corp.),* 35 B.R. 544, 547–548 (Bankr.S.D. Fla.1983). Thus any right of Vylene to continue the franchise must rest on renewal rights contained in the franchise agreement or provided by state law. *Id.,* 35 B.R.

at 547; *In re Roswog*, 48 B.R. 689, 691 (Bankr.M.D.Pa.1985).

■ Although the franchise agreement has no choice of law provision, it is clear that California law governs the rights of the parties herein, insofar as they are determined by state law. Both Vylene and Naugles are California corporations. The franchise agreement was entered into in California, and was performed in California.

### a. *Renewal Provision of Franchise Agreement*

Franchise agreements normally provide specifically for the terms and conditions of renewal. Although the franchise agreement in this case provides for an eight-year renewal term, it provides only that the conditions of renewal are to be negotiated by the parties upon the giving of proper notice, which was given in this case.

The renewal provision of the franchise agreement states as follows:

> Provided the FRANCHISEE has not been in default, he shall have the option upon giving sixty (60) days' advance notice in writing thereof to FRANCHISOR, a right of first refusal to extend this franchise at the termination date for an additional eight years on terms and conditions to be negotiated within said sixty (60) days.

For the interpretation of this provision, the Court must turn to California case law and statutory provisions.

### b. *Case Law—Franchise Renewal*

The Court has found only four cases on franchise renewal rights, and only one applying California law. In *Davis v. Gulf Oil Corp.*, 572 F.Supp. 1393 (C.D.Cal.1983), the court denied any right to renewal because it found that the franchisee had voluntarily abandoned the gasoline station franchise after rejecting a renewal offer. *Davis* was decided under a California statute, California Business & Professions Code § 20999 (West 1986 supp.) that is limited to gasoline stations. In *McDonald's Corp. v. Markim, Inc.*, 209 Neb. 49, 306 N.W.2d 158, 163 (1981), a narrow majority of a divided court found that renewal language providing for "first consideration for an additional franchise period" placed no significant obligation on the franchisor.[9] The court held that the non-renewal was not capricious, and on this basis sustained the non-renewal. In *In re Roswog*, 48 B.R. 689, 692 (Bankr.M.D.Pa.1985) the court sustained the non-renewal of a franchise because the franchisee had failed to give timely notice of renewal. In *White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*, 5 B.R. 112, 117 (M.D.Tenn.1980), the court granted relief from stay because the dealership agreement had terminated according to its terms, and had no renewal provision.

The Court finds none of these cases applicable. Unlike the *Davis* case, the debtor has not abandoned the franchise in this case. Furthermore, the gasoline station statute involved in *Davis* is inapplicable here. The right of first refusal in this case is much stronger than the "first consideration" that the bare majority of the court found insignificant in *McDonald's*. *Roswog* is not applicable because Vylene gave timely notice of renewal in this case. *White Motor* is inapposite because in that case there was no renewal provision.

### c. *Good Faith and Fair Dealing*

The franchise renewal provision is supplemented by an implied covenant of good faith and fair dealing. California law has a strong policy incorporating this covenant into every contract. The California Supreme Court formulated this standard in *Seaman's Direct Buying Service, Inc. v. Standard Oil Company of California*, 36 Cal.3d 752, 768, 206 Cal.Rptr. 354 (1984), as

---

**9.** Similarly, in *Orchard v. Covelli*, 590 F.Supp. 1548, 1554 (W.D.Pa.1984), the court held that an identical McDonald's Corporation franchise renewal provision was so insubstantial that the majority shareholder did not misappropriate a corporate opportunity when renewed the franchises in his own name.

follows: "Broadly stated, that covenant [of good faith and fair dealing] requires that neither party will do anything which will deprive the other of the benefits of the agreement." California law implies this covenant in every contract. *Id.* This implied covenant of good faith and fair dealing provides the key to whether Naugles will likely prevail on the merits herein.

Under the franchise agreement, Naugles received periodic financial reports from Vylene, and was well aware of its financial status. It thus knew that the proposed renewal terms would not permit the profitable operation of the Vylene franchise. There is no evidence before the Court that Naugles was prepared to enter into a viable agreement for renewal of the franchise, except for its statement in oral argument that it was prepared to negotiate in good faith. The parties agree that they never came close to an agreement concerning a renewal of the franchise.

Naugles tries to narrow the scope of the implied covenant of good faith and fair dealing by arguing that it developed in the insurance and employment contexts. Insofar as breach of the covenant gives rise to tort remedies (including punitive damages), California cases have applied it only in the areas of insurance, employment and banking. *See, e.g., Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 820, 169 Cal. Rptr. 691 (1979), *appeal dismissed and cert. denied,* 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980) (insurance); *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 456, 168 Cal.Rptr. 722 (2d Dist.1980) (employment); *Commercial Cotton Co. v. United California Bank,* 163 Cal.App.3d 511, 516, 209 Cal.Rptr. 551 (4th Dist.1985), *modified,* 164 Cal.App.3d 493(a) (4th Dist. 1985) (banking). However, contract remedies are available for violation of this covenant in every contract. *Seaman's, supra,* 36 Cal.3d at 768, 206 Cal.Rptr. 354.

In *Seaman's, supra,* the California Supreme Court deferred a decision on whether tort remedies are available for contracts in other contexts. Vylene invites the Court to extend the tort remedy to franchises. Because the Court finds Vylene's contract remedies to be adequate, it does not reach this issue.

■ Naugles argues that the franchise has expired because no renewal terms were agreed to in the 60-day period prior to December 30, 1985, as required by the franchise agreement. Naugles cannot prevail on this argument. The 60-day negotiation period presupposes that the parties would bargain in good faith in a serious attempt to reach agreement during this time. Good faith bargaining is a condition precedent to the expiration of the franchise after notice has been given to exercise the renewal right. In this case the condition precedent was not satisfied, and as of this date it still has not been satisfied. Thus the Court holds that the right to negotiate a renewal of the franchise has not yet expired.

■ Naugles argues that the renewal provision is unenforceable, because it is too uncertain and is a mere agreement to agree in the future. In essence, Naugles asks the Court to disregard the renewal provision altogether, and to hold that Vylene has no renewal rights at all.[10] The Court does not find the provision so uncertain. The Court holds that the provision requires the parties to bargain in good faith for reasonable terms for the eight-year renewal period.

It appears to the Court that reasonable terms of renewal are appropriate. If this adversary proceeding must be decided by the Court, the Court will determine the reasonable renewal terms. However, it is much preferable that the parties commence good faith negotiations to resolve this dispute.

**d. *Franchise Investment Law***

■ Vylene argues that Naugles breached the disclosure requirements of

---

**10.** If the Court were to hold that the renewal provision is unenforceable, it likely would violate the California Franchise Investment Law,

California Business & Professions Code § 31111(k) (West 1986 supp.).

the California Franchise Investment Law, California Corporations Code §§ 31000 *et seq.* (West 1977), because in 1975 it failed to disclose the complete terms and conditions of renewal. In consequence, Vylene argues, Naugles is prohibited from imposing and undisclosed conditions on renewal of the franchise. Essentially, Vylene argues that the franchise must be renewed on the same terms and conditions as the original franchise, with no renewal fee whatever.

Vylene in its complaint contends that Naugles was subject to the disclosure requirements of section 31101, which are applicable to unregistered franchise offerings. Naugles argues that this provision is inapplicable, because it registered its franchise sale to Vylene. While technically correct, Naugles' argument produces no benefit to it: A registration application must include: "a statement of the conditions under which the franchise agreement may be terminated or renewal refused, or repurchased at the option of the franchisor." California Corporations Code § 31111(k) (West 1977).

Section 31114 requires that the material information contained in the registration statement be included in a proposed prospectus. Naugles apparently concedes that the renewal provisions are material. Section 31119 requires that the prospectus be delivered to the prospective franchisee at least 48 hours before he signs a binding agreement or delivers consideration to the franchisor.[11]

No reported California case has interpreted section 31111(k). Thus the Court must construe it without the guidance of any California case law.

Unlike the subsequently promulgated Federal Trade Commission rule, which requires disclosure of the conditions under which a franchisee may renew or extend a franchise,[12] section 31111(k) only requires the disclosure of the conditions under which Naugles may *refuse* a renewal. These conditions are stated in the renewal provision of the franchise agreement: Renewal may be refused if the franchisee "has been in default." Disclosure of the terms and conditions of renewal is not required by the California Franchise Investment Law.

Thus Vylene cannot defeat a preliminary injunction on the grounds of violation of the California Franchise Investment Law.[13]

### e. *Other Vylene Arguments*

Vylene makes two additional arguments against the preliminary injunction, which the Court finds unpersuasive.

---

**11.** While Naugles has provided a copy of a signed receipt showing delivery of the prospectus to Vylene on December 19, 1975, neither party has provided a copy of the prospectus delivered to Vylene. The franchise agreement and the prospectus filed with the registration statement stated that the eight-year renewal was to be "on terms and conditions *to be designated by franchisor* within 30 days after receipt by franchisor of 60 days advance notice in writing from franchisee of his desire to extend said term" (emphasis added). The language approved by the California Department of Corporations thus differed from that in the Vylene contract. Presumably the language in Vylene's prospectus also misstated the contract provision. In any event, the prospectus contained no further disclosure of the renewal terms.

**12.** Effective July 21, 1979 the Federal Trade Commission adopted a much stronger rule, requiring franchisor to disclose to a potential franchisee:

(ii) The conditions under which the franchisee may renew or extend;
(iii) The conditions under which the franchisor may refuse to renew or extend;

(vii) The franchisee's interest upon termination of the franchise, or upon refusal to renew or extend the franchise, whether by the franchisor or by the franchisee....

16 C.F.R. § 436.1(a)(15) (1986). The FTC rule apparently contemplates that if a franchise is not renewed, the franchisee has a right to sell the franchise or to be bought out by the franchisor. In contrast, Naugles offers neither option to Vylene.

**13.** Naugles also argues that this claim is barred by the four-year statute of limitations applicable to the California Franchise Investment Law, California Corporations Code § 31303 (West 1977). Because the Court finds no non-compliance with this statute, it does not reach this issue.

■ First, Vylene argues that Naugles failed to comply with the California Franchise Relations Act, California Business & Professions Code §§ 20000 *et seq.* (West 1986 supp.) Section 20025 requires a 180-day notice of an intent not to renew, and places certain other restrictions on non-renewal. This statute is inapplicable, because section 20041 provides that the statute applies "only to franchises granted or renewed on or after January 1, 1981 or to franchises of an indefinite duration which may be terminated by the franchisee or franchisor without cause." Because the Vylene franchise was entered into on December 30, 1975 and has a definite term, the California Franchise Relations Act is inapplicable.

Second, Vylene argues that Naugles is estopped from refusing to renew its franchise. The elements of estoppel under California law are: (1) representation or concealment of material fact (2) made with knowledge of the facts (3) to a party ignorant of the truth (4) with the intention that the latter act upon it, and (5) that the party was thereby induced to act upon it. *See, e.g., California Milling Corp. v. White,* 229 Cal.App.2d 469, 479, 40 Cal.Rptr. 301 (5th Dist.1964). Vylene makes no effort to show any of these elements.

### C. *Second Formulation of Standard*

■ Under the second formulation of the standard for qualification for a preliminary injunction, Naugles must show that the balance of hardships tips sharply in its favor, and that it has a serious possibility of prevailing on the merits.

While Naugles may satisfy this much lesser level of proof on the likelihood of prevailing on the merits, it makes no showing that the balance of hardships weighs more heavily upon it than upon Vylene. Indeed, a preliminary injunction that prohibits the use of the Naugles trademarks would create a substantial disruption of Vylene's business. To remain in business, Vylene would be required to change all of its signs and advertising to eliminate the use of Naugles' trademarks. *Cf. Culligan International Co. v. Culligan Water Conditioning,* 563 F.Supp. 1265, 1272 (D.Minn. 1983). In contrast, the continued use of the trademarks by Vylene *pendente lite* would likely impose rather minor harm on Naugles. *Id.*

Thus the balance of hardships weighs decidedly in favor of Vylene, and the injunction must also be denied under the second formulation of the Ninth Circuit standard.

### D. *Public Interest*

■ The public interest factor also weighs strongly against a preliminary injunction in favor of Naugles in this adversary proceeding. If Naugles is granted a preliminary injunction, a successful reorganization of Vylene will be rendered impossible, and there will be little or nothing to liquidate for the benefit of Vylene's creditors. The denial of an injunction, on the other hand, may permit Vylene to reorganize effectively, and to make payment to its creditors.

Furthermore, the value of the Vylene franchise, which Naugles has recently offered to purchase for $80,000, was created largely by the efforts and hard work of Vylene over the past ten years. It is inequitable to permit Naugles to take the entire benefit of this valuable business, and to leave nothing to pay the creditors resulting from Vylene's ten year operation of the franchise.

Finally, the denial of a preliminary injunction will preserve the status quo until a final determination of the merits of this adversary proceeding.

### E. *Clean Hands*

■ To qualify for equitable relief such as a preliminary injunction, a party seeking such relief normally must come before the Court with clean hands. While Naugles' hands are not clearly dirty, there are two factors that suggest that Naugles has not acted wholly honorable in its relations with Vylene.

First, in 1983 Naugles denied Vylene's request for a franchise to open a similar restaurant in Cypress, California. Deborah Greene, the owner of Vylene, then opened a restaurant at the proposed Cypress location that was similar to a Naugles franchise, but which did not use the Naugles name or any of its trademarks. Naugles charged her with trademark infringement, and threatened to terminate Vylene's Long Beach franchise if the restaurant was not closed. In consequence, Ms. Greene closed the Cypress restaurant and discontinued doing business at that location. Within a few months thereafter, however, Naugles opened its own restaurant at the same location.

Second, the opening of a new Naugles store less than a mile and a half distant from Vylene's franchise in Long Beach and the charging of lower prices there also raises a question of clean hands and good faith. Naugles defends the new store on the grounds that it draws business from a different clientele, and that it does not actually compete with Vylene's store. Naugles defends its price cutting on the grounds that it has cut its prices everywhere in response to competition, and that it has offered the new menu and pricing to Vylene as well.

Vylene, in response, points to evidence that its business has declined substantially since the opening of the new Naugles restaurant. This conduct by Naugles may also be a violation of section 2 of the Sherman Act, 15 U.S.C. § 2. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 714–719 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). However, a mere reduction in patronage, while suggesting a causal connection, falls substantially short of establishing such a connection.[14] This evidence is thus likewise inconclusive.

## VI. PAYMENT OF FRANCHISE FEES AND RENT

Vylene has not paid franchise fees or rent to Naugles since the end of 1985. Vylene argues that the alleged unfair competition by Naugles in opening the competing store nearby should excuse the payment of these charges.

Under a new franchise agreement Naugles would obviously be entitled to some franchise fee and rental payments, even if its new restaurant does compete improperly with the Vylene restaurant. In consequence, the Court determines that Vylene should pay the sum of $2,000 per month, beginning September 1, 1986, to Naugles as provisional franchise fees and rental payments pending a determination of the merits of this case or further order of the Court. This payment is a condition of the denial of the preliminary injunction.

## VII. CONCLUSION

In conclusion, the Court determines first that Naugles has not made a sufficient showing to qualify for a preliminary injunction to prohibit Vylene from using the Naugles trademarks pending a determination on the merits of this adversary proceeding. However, the Court finds that Naugles is entitled to interim payments in the amount of $2,000 per month in franchise fee and rental payments pending a determination of the merits. Further, the bringing of this motion for a preliminary injunction in the pending adversary proceeding is not a violation of the automatic stay. Finally, the Court finds that this is a core proceeding under 28 U.S.C. § 157.

The foregoing constitutes the Court's findings of fact and conclusions of law. Vylene shall submit an order consistent herewith.

14. Vylene's reasoning illustrates the logical fallacy of *post hoc ergo propter hoc.* The underlying principle is that a causal connection is not shown by the fact that event A has followed event B or even if event A regularly follows event B. Such a series of events may suggest a causal connection, that may be discovered by further investigation. However, there is a wide variety of possible causal connections. Thus, even if such a connection is be found, it may be different than "B caused A."