In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-1730

PAUL J. RENARD,

*Petitioner-Appellant,*

*v.*

AMERIPRISE FINANCIAL SERVICES, INC.,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CV-555-JPS — **J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 22, 2014 — DECIDED JANUARY 30, 2015

Before WOOD, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. At the time Ameriprise Financial Services fired Paul J. Renard, one of its financial advisers, Ameriprise took the position that Renard owed it money. Renard did not agree, and so Ameriprise initiated arbitration to resolve the issue. At the arbitration, Renard denied that he had any debts to Ameriprise and filed several counterclaims

against the firm. The arbitrators rejected Renard's counter-claims and awarded Ameriprise most of what it sought.

Renard did not accept the panel's decision; instead, he filed suit in state court to vacate the award. Ameriprise re-moved the action to the federal district court and asked the court to confirm the award. The court obliged, and added an order requiring Renard to pay additional interest. Renard has now appealed, arguing that Ameriprise's counsel pro-cured the arbitral award through fraud and that the arbitra-tors acted in manifest disregard of both the Wisconsin Fair Dealership Law (WFDL) and Minnesota tort law. His show-ing, however, falls far short of the high standard needed to upset the outcome of an arbitral proceeding, and so we af-firm the district court's judgment.

## I

Ameriprise is a member of the Financial Industry Regula-tory Authority (FINRA), a self-regulatory organization that oversees brokerage firms and exchange markets. On August 6, 2009, Ameriprise and Renard entered into a franchise agreement under which Renard became a financial adviser affiliated with Ameriprise. Minnesota law governs the agreement, with the exception of "all issues relating to arbi-trability," which are "governed by the terms set forth in [the] agreement, and to the extent not inconsistent with this agreement, by the rules of arbitration of FINRA." Franchise Agr. § 26.A. The agreement to arbitrate states that it "is gov-erned by and enforceable under the terms of the Federal Ar-bitration Act." *Id.* at § 27.H.

On May 11, 2011, after receiving a customer complaint that Renard had solicited exchange-traded fund (ETF) trans-

actions in contravention of Ameriprise policy, Ameriprise placed Renard under special regulatory supervision. On June 22, 2011, Ameriprise issued a Notice of Termination to Renard. The Notice detailed several reasons for his dismissal: Renard allegedly solicited inverse and leveraged ETF transactions, marked solicited orders as unsolicited, used unapproved sales literature and an external email system, and failed to update certain forms. The Notice asserted that Renard had breached the franchise agreement by engaging in these actions and that Ameriprise was thus entitled to terminate the agreement.

While Renard was affiliated with Ameriprise, Ameriprise had loaned him money to build his practice. In exchange for the loans, Renard had executed four promissory notes, which required Renard to pay the full amount immediately if Renard's affiliation with Ameriprise ever ended. Ameriprise's termination of its relationship with Renard thus caused the unpaid balances on the promissory notes, totaling approximately $530,000, to become due. After Renard failed to make immediate payments on the notes, Ameriprise initiated arbitration under the auspices of FINRA, as specified by the franchise agreement's arbitration clause. See Franchise Agr. § 27.A.

A panel of three arbitrators held an evidentiary hearing in Milwaukee, Wisconsin. Renard argued that he did not have to pay the notes because Ameriprise had breached the franchise agreement and violated the WFDL, Wis. Stat. Ann. § 135.01 *et seq.* Renard also counterclaimed for violations of the WFDL, interference with contractual relations, interference with prospective advantage, conversion, misrepresentation, and breach of contract. The panel dismissed Renard's

counterclaims and awarded $448,200 in compensatory damages to Ameriprise. This amount was approximately $100,000 less than Ameriprise had sought. The panel did not explain its decision.

Unhappy with that outcome, Renard filed a petition in Wisconsin state court to vacate the arbitral award under Wis. Stat. Ann. § 788.10 and for judgment notwithstanding the award under Wis. Stat. Ann. § 805.14(5)(b). Ameriprise removed the case to federal court based on diversity jurisdiction, as Ameriprise is a Delaware corporation with its principal place of business in Minnesota, Renard is a Wisconsin citizen, and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332. Ameriprise filed a motion to confirm the award in the district court. Renard petitioned to vacate or modify the award, alleging 1) that the arbitrators exceeded their powers by manifestly disregarding the WFDL and Minnesota law, 2) that the award was procured by fraud, and 3) that the arbitration panel should have kept the record open longer. (Renard has dropped this last contention on appeal.) The district court denied Renard's petition, confirmed the award, and ordered Renard to pay post-judgment interest in the amount of $16,909.56. Renard now appeals.

## II

In examining a district court's confirmation of an arbitral award, we review questions of law *de novo* and the district court's findings of fact for clear error. *Publicis Commc'n v. True N. Commc'ns, Inc.*, 206 F.3d 725, 728 (7th Cir. 2000). Renard alleges two principal bases for vacatur: that the award was procured by fraud and that the arbitrators manifestly disregarded the law. Neither argument can carry the day for him.

The district court was correct to review the award under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, rather than under the Wisconsin Arbitration Act (WAA), Wis. Stat. Ann. § 788.01 *et seq.* As we noted, the franchise agreement generally is governed by Minnesota law, but it specifically removes arbitration from this blanket statement. See Franchise Agr. § 26.A. In a section entitled "Arbitration," the agreement states that the arbitration clause "is governed by and enforceable under the terms of the Federal Arbitration Act." *Id.* at § 27.H. As we will see, Renard has no way around this language.

Renard first argues that applying the FAA instead of the WAA would circumvent the WFDL (and Wisconsin's public policy as expressed by that law) because the FAA has a more stringent standard for what constitutes "manifest disregard of the law." The WFDL governs relations between dealers and dealership grantors in Wisconsin, providing, among other things, limitations on grantors' ability to terminate or modify dealership agreements. The WFDL does not, however, prescribe the details of any possible arbitration agreements between dealers and grantors; in fact, it does not mention the WAA at all. Moreover, there is no reason to think that review under the FAA will systematically circumvent the WFDL more than review under the WAA. Finally, even if there were reason to think that (and there is not), a long line of cases shows that the FAA preempts inconsistent state law. See, *e.g.*, *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (FAA preempts California common law rule regarding the unconscionability of class arbitration waivers in consumer contracts); *Preston v. Ferrer*, 552 U.S. 346, 359 (2008) ("When parties agree to arbitrate all questions arising under a contract, the FAA supersedes state laws

lodging primary jurisdiction in another forum."); *Oblix, Inc. v. Winiecki*, 374 F.3d 488, 492 (7th Cir. 2004) ("If a state treats arbitration differently, and imposes on form arbitration clauses more or different requirements from those imposed on other clauses, then its approach is preempted by § 2 of the Federal Arbitration Act.").

Renard alleges in the alternative that the parties chose Wisconsin law to govern the arbitration, despite the plain language identifying the FAA as the governing law. He suggests that the parties' choice to arbitrate in Wisconsin demonstrates that they also selected the WAA. But the place of arbitration has no necessary connection to the rules that will govern the proceeding. This is especially true if the parties have expressly elected an arbitral regime, as these parties did in adopting the FAA. If we were to accept Renard's argument, the FAA would *never* govern an arbitration held in a state that had its own arbitration statute, even if the parties expressly selected the FAA in their agreement to arbitrate. Renard also points to an addendum to the franchise agreement that states that "the Wisconsin Fair Dealership Law, to the extent applicable, supersedes any provisions in the Franchise Agreement that are inconsistent with that Law." But again, the WFDL does not require a particular legal framework for arbitral proceedings between dealers and grantors. The WFDL thus does not "supersede" the agreement's provision selecting the FAA.

Finally, Renard claims that *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), required the district court to apply state law (the WAA) rather than federal law (the FAA) to this agreement. Unfortunately for him, the Supreme Court has firmly rejected this argument. See *Prima Paint Corp. v. Flood &*

*Conklin Mfg. Co.*, 388 U.S. 395, 405 (1967); see also *Southland Corp. v. Keating*, 465 U.S. 1, 23 (1984) (noting that *Prima Paint* "held that the FAA may constitutionally be applied to proceedings in a federal diversity court"). The district court was therefore correct to analyze the award under the FAA. We now move on to Renard's substantive arguments.

*Manifest Disregard of the Law*

Federal court review of arbitral awards is limited. See *Nat'l Wrecking Co. v. Local 731, Int'l Bhd. of Teamsters*, 990 F.2d 957, 960 (7th Cir. 1993) ("Arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party."). An arbitral award cannot be vacated pursuant to the FAA merely because the petitioner "show[s] that the panel committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). It may be set aside only if one of the criteria specified in 9 U.S.C. § 10 is present—as relevant here, only if "the arbitrator deliberately disregards what he knows to be the law." *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994); see *George Watts & Son, Inc. v. Tiffany and Co.*, 248 F.3d 577, 579–81 (7th Cir. 2001) (explaining that "manifest disregard of the law" exists only if the arbitrator directs the parties to violate the law). Simple mistake of law is not enough. Thus, even if these arbitrators erred in their application of Minnesota law or the WFDL, such an error falls short of a manifest disregard of the law.

Renard's argument before the arbitrators was simple. As we noted above, an addendum to the franchise agreement states that the WFDL, "to the extent applicable, supersedes

any provisions in the Franchise Agreement that are inconsistent with that Law." The WFDL requires the grantor, Ameriprise, to give the dealer, Renard, written notice 90 days prior to the termination of a franchise agreement and 60 days to cure the deficiency at the root of the termination. See WIS. STAT. ANN. § 135.04. It is undisputed that Ameriprise did not comply with this provision; Ameriprise fired Renard with no notice or chance to cure. Renard maintained that Ameriprise's actions thus violated the WFDL and, therefore, the franchise agreement. He also accused Ameriprise of tortious interference with business relations and conversion because Ameriprise notified Renard's clients that it was placing them with a different financial advisor, and it forced Renard to transfer incoming calls to that advisor. These claims stem directly from the alleged WFDL violations; Renard concedes that these allegations necessarily fail if Ameriprise did not wrongfully terminate his contract.

Ameriprise argued in response that federal securities laws preempt the WFDL's notice and cure provisions. It contended that Renard had violated Securities and Exchange Commission Rule 17a-3, which requires accurate bookkeeping, and Rule 10b-5, which prohibits fraud in connection with the purchase or sale of securities. See 17 C.F.R. § 240.17a-3; 17 C.F.R. § 240.10b-5. Ameriprise then asserted that it was exposed to liability for these violations because Renard was formally associated with the company. See 15 U.S.C. § 78u-1(a)(3), (b)(1)(B). Since giving Renard 90 days' notice and a chance to cure, instead of immediately dismissing him, would leave Ameriprise vulnerable to federal liability, Ameriprise claimed, these federal laws and regulations preempted the relevant WFDL provisions and allowed it to fire Renard immediately.

Renard brushes these concerns aside and contends that the arbitrators exceeded their power by failing to apply the WFDL to these facts. Given the clear noncompliance with the WFDL's notice and cure provisions, Renard assumes that the panel must have agreed with Ameriprise that federal securities laws preempt his WFDL claims. Perhaps this is the best reading of the tea leaves. And perhaps Renard is right that this was an incorrect application of the law. But even he concedes that the arbitrators analyzed the WFDL, and that is enough to doom his claim in federal court. It is not manifest disregard of a law to consider that law and its relation to other laws and then conclude that the law does not apply in the specific factual situation at issue. This conclusion is straightforward here, given the fact that Ameriprise presented its preemption argument to the arbitrators. They did what the parties contracted for: they resolved the issue on the basis of the laws and arguments presented to them.

Renard's assertion that the panel manifestly disregarded Minnesota law with respect to his intentional tort claims fails for essentially the same reason. If the panel could have found that the WFDL was preempted (and thus that Ameriprise's termination of Renard was legal), then it also could have concluded that Ameriprise did not commit these torts. Under Minnesota law, both tortious interference with business relations and conversion require the defendant to act without justification. See, *e.g.*, *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (conversion); *Harbor Broad., Inc. v. Boundary Waters Broadcasters, Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001) (tortious interference with business relations). The actions of which Renard complains—including transferring clients and forwarding calls—were taken in connection with his departure. If Ameriprise

was justified in terminating its relationship with Renard, the intentional tort claims fall away. As we noted, Ameriprise presented the panel with a basis for finding that the termination was justified. It is possible, or maybe likely, that the panel determined that federal securities laws preempt the WFDL such that Ameriprise's dismissal of Renard was justified. This finding would compel a conclusion that the actions Ameriprise took were legal.

Because the panel did not issue a written opinion, we do not know how it reached its conclusions. But nothing suggests that it strayed so far that the "manifest disregard" standard has been triggered. Ameriprise suggests alternative interpretative paths to explain the panel's decision aside from its preemption argument: perhaps the panel found that Ameriprise *did* violate the WFDL but that Renard did not prove damages, or maybe Renard failed to state a conversion claim because client lists are not "property" for purposes of this tort. All this goes to show that we should not second-guess the arbitrators' decision based on speculation when it is possible for the panel to have reached the decision it did based on the evidence presented to it. We therefore find that the panel did not act in manifest disregard of either the WFDL or Minnesota tort law.

*Fraud*

Renard also accuses Ameriprise of procuring the arbitral award by fraud. See 9 U.S.C. § 10(a)(1) (permitting courts to vacate arbitral awards that were procured through fraud). For a court to vacate, the fraud must be "(1) not discoverable upon the exercise of due diligence prior to the arbitration; (2) materially related to an issue in the arbitration; and (3) established by clear and convincing evidence." *Gingiss Int'l, Inc. v.*

*Bormet*, 58 F.3d 328, 333 (7th Cir. 1995) (citing *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1404 (9th Cir. 1992)). Renard cannot prevail, however, because Ameriprise's conduct did not constitute fraud in any sense of that term.

Renard first complains about certain remarks of Ameriprise's counsel in closing arguments. Counsel stated that Renard had committed fraud and violated federal securities laws, even though Renard had not been convicted of any such violations. But closing arguments are not evidence, and attorneys are permitted to make arguments based on reasonable inferences from evidence that was presented. See *United States v. Vargas*, 583 F.2d 380, 385 (7th Cir. 1978). Although Renard had not been convicted of fraud or related legal infractions, he responded "Correct" when asked if he lied on forms regarding the solicitation of ETFs and "Correct" when later questioned as to whether he "broke the rules" in doing so. That Renard had broken the law was a reasonable inference from this and similar testimony heard throughout the evidentiary hearing. Counsel's remarks thus did not misrepresent the record, much less amount to fraud.

Renard next points to Ameriprise's counsel's use—again in closing arguments—of two cases to support the contention that federal securities laws preempt the WFDL. When counsel brought up *Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984), he stated that the case was "specifically on point" and that "[a]ny right to cure to prevent termination provided by the Wisconsin Fair Dealership Law has been preempted by this federal law—and it's a different issue, but it's saying that the Wisconsin Fair Dealership Act was absolutely preempted by federal law." In discussing *Bantum v. Am. Stock Exch., LLC*, 7 A.D.3d 551 (N.Y. App. Div. 2004)

(Second Dep't), counsel said that the case stood for the proposition that Congress, when it enacted federal securities laws, "intended to preempt state interference with self-regulatory organizations" such as the American Stock Exchange and FINRA.

Renard argues that counsel should not have used these cases—or at least should have been more clear about their specific holdings—because they did not actually hold that federal securities laws preempt the WFDL. Instead, *Moody* held that a different federal law preempts the WFDL, and *Bantum* found that federal securities laws preempt a different state statute. Attorneys are not prohibited from analogizing cases to the facts before them, however, nor from drawing inferences from existing case law. In fact, doing so is an essential component of an attorney's job. Ameriprise's counsel did not misrepresent *Moody* or *Bantum*. Although he did not spell out the differences between those cases and the present situation, he was making an argument from analogy and thus was not engaging in fraud. Renard also points to *Lucarelli v. New York Mercantile Exch.*, 24 A.D.3d 117 (N.Y. App. Div. 2005) (First Dep't), a later New York case that found that federal law did *not* preempt the New York Human Rights Laws, as *Bantum* had held. But the fact that a different New York appellate court came to a contradictory conclusion does not make *Bantum* bad law.

In short, the closing arguments made by counsel for Ameriprise were well within the bounds of permissible actions before an arbitral panel. This is not what the FAA means when it lists "fraud" as a ground for setting aside an award.

*Remaining Arguments*

Renard's other arguments have even less merit. He asserts that the panel lacked an evidentiary basis from which to find that Ameriprise fired him because he violated federal securities laws. He points to the Form U-5 that Ameriprise filed averring that Renard had not been under internal investigation for violations of securities laws and regulations at the time of his termination. This form, however, is not in the record. And even if we could consider it, Renard's argument is unavailing, because Ameriprise indicated in the same form that Renard had been discharged after allegations that he had violated the securities laws. Moreover, Renard admitted during the evidentiary hearing that he lied about soliciting ETFs. Even if the evidence was thin, it was presented to the arbitral panel and could have formed the basis of the panel's decision.

Finally, Renard claims that the panel's decision is inconsistent with § 17.B of the franchise agreement, which states:

> Immediate Termination with Cause ... In the event Ameriprise Financial believes any law may prohibit the immediate termination of this Agreement, Ameriprise Financial may immediately suspend Independent Advisor, who shall remain suspended until such time as Ameriprise Financial either terminates this Agreement or ends the suspension.

Renard's argument makes little sense. This section merely provides that Ameriprise *may* suspend—rather than fire—Renard *if it believes* any law prohibits immediate dismissal. Ameriprise did not believe that a law prohibited immediate action, and so it did not suspend Renard. This is consistent with the panel's apparent conclusion that federal securities

laws preempt the WFDL and Ameriprise was thus within its rights immediately to discharge Renard.

### III

The district court was correct to confirm the award. We cannot substitute our interpretation of the law for that of the arbitrators, and we are satisfied that the panel reached a result on the basis of the law and evidence presented to it. Moreover, Ameriprise's counsel did not act fraudulently when he stated that Renard violated federal securities laws and made references to cases suggesting that those laws could preempt the WFDL. We therefore AFFIRM the judgment of the district court.